[No. B022085. Second Dist., Div. One. Feb. 25, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT MOSHE ROSENKRANTZ, Defendant and Appellant.

1188

**COUNSEL**

Dennis A. Fischer for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Mark E. Turchin and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**HANSON (Thaxton), J.—**

### INTRODUCTION

By information, defendant was charged with murder in violation of Penal Code section 187. It was also alleged that in the commission of the offense, defendant personally used a firearm, a semi-automatic carbine, within the

meaning of Penal Code sections 12022.5 and 1203.06, subdivision (a)(1). Defendant entered a plea of not guilty and denied the use allegation.

Trial was by jury. The jury found defendant guilty of second degree murder. The special allegation concerning firearm use was found to be true. Defendant's motion for new trial was denied, as was his motion to reduce the conviction to manslaughter. Defendant was sentenced to state prison for the term prescribed by law, 15 years to life. The trial court also ordered that defendant be sentenced to two additional years because of the special allegation. Defendant has appealed from the judgment of conviction.

### FACTUAL STATEMENT

We summarize the evidence adduced below, mindful of the familiar standard of review applicable when a defendant challenges the sufficiency of the evidence supporting a judgment of conviction. ■ As was stated in *People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255], "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."

In June of 1985, defendant Robert Rosenkrantz was 18 years of age and graduating from high school. He lived with his parents and two brothers, Joey and Joshua, in Calabasas. Joey was approximately 16 years old; sometimes he and defendant did not get along well. The two boys shared a telephone at the family home. About two weeks before defendant's graduation, Joey began eavesdropping on the telephone line, using a device provided by his 17-year-old friend, Steven Redman. The device recorded telephone conversations and Joey listened to the recordings. After hearing some of defendant's conversations with another young male, Joey suspected defendant was a homosexual. He heard defendant plan to meet this person and go to a beach house in Hermosa Beach which belonged to the Rosenkrantz family on the night of June 21, the night defendant was graduating from high school.

Joey discussed this development with his friend, Steven, who suggested that he and Joey should also go to the beach house that evening, to gather information about defendant's homosexuality. On June 21, Joey and Steven arrived at the beach house and looked in a window. There they saw three young men and a female; one of the young men was defendant. The group inside were drinking and watching television. After an hour or so, defendant and one of the young men went into a bedroom. Joey and Steven, who

had a camera, could not hear or see what was happening. Joey wanted to leave, but Steven persuaded him to stay while Steven ran into the house and took pictures with the camera. Before making this entry, Joey and Steven went to their car. Steven got a flashlight and Joey a stun gun, kept in the car for protection. Then they went to the front door, which Joey unlocked.

Steven kicked in the door, yelling "Get the fuck out of here you faggots." Defendant came out of the bedroom into the hallway. His companion, Michael, also came out. Joey, carrying the stun gun, told defendant that he wanted defendant to know he knew about defendant's homosexuality, and told defendant he expected defendant to leave him alone in the future. Defendant said to Joey, "You're not getting out of here." Defendant advanced upon Joey, and they struggled for control of the stun gun. Joey burned defendant's hands with the gun. Defendant and Joey entered one of the bedrooms as they continued to struggle. Meanwhile Steven was using the flashlight to keep Michael away from him, but Michael started punching Steven.

During this melee, defendant got control of the stun gun, but got hit by Steven's flashlight several times; defendant's nose was broken. Defendant used the stun gun on Joey, and burned Joey on the face. Defendant's friends at the beach house intervened and the fighting stopped, but defendant sent one of his guests, Rubin, to his car to obtain defendant's BB pistol. Defendant and Rubin kept Joey from leaving the house. Joey referred to certain "tapes" he had made of telephone calls which would confirm defendant's homosexuality, and declared that these tapes would be heard by others if anything happened to him. Joey convinced defendant the tapes were in his car.

Defendant and Rubin, one armed with the stun gun and the other with the BB pistol, finally accompanied Joey to his car; Michael stayed with Steven. Joey professed not to remember where his car was, and managed to escape from defendant and Rubin into a store. The storekeeper called the police, after Joey told him defendant and Rubin were trying to rob him.

When the police arrived, Joey told the police that Steven was being held hostage at the beach house. The police escorted Joey back to the beach house but defendant and Rubin had left. The police regarded the incident as a brotherly fight, and said they were not going to make a report. After the police left, Joey called his father, because someone had taken his car keys. The boys' father drove to the beach house and spoke to defendant who had returned; defendant gave his father Joey's keys, and Joey and Steven drove home. Before they left, however, Steven told Joey's father that they had

seen defendant and another person with his pants down. Joey did not dispute Steven's story.

The next day defendant and Joey decided that Joey would tell their father the whole thing had been a joke; that defendant was not gay and that Steven and Joey had lied about defendant's sexual activities. Defendant had already had a conversation with his father that morning, during which he had insisted that he was heterosexual; his father had broken down and cried, because the thought that defendant might be homosexual was very upsetting. Joey recanted his story about defendant's homosexual conduct. The boys' father summoned Steve Redman, who modified his story about what he had actually observed the previous evening. Gradually, however, the boys' father received an accurate picture of what had transpired, and realized that defendant was a homosexual. Defendant's father at first decided not to confront defendant about this, but his decision was shortlived. He did confront defendant, and questioned him very angrily about his activities and his contacts. Defendant retreated to his room, and took his belongings and left the house on Saturday, June 22. Defendant slept in his car.

On Monday, June 24, defendant went to the Agoura Indoor Shooting Range in the early afternoon. Frank Georgianna, a friend of the owners of the range, was helping out behind the counter. Defendant asked to use the Uzi semiautomatic nine millimeter carbine. After looking at defendant's driver's license and having defendant fill out a form, Georgianna rented a Uzi with ammunition and targets to defendant. According to Georgianna, when he asked defendant if he knew how to operate the Uzi, defendant said that he did.

Defendant shot the weapon on the firing range for 10 or 15 minutes; he used half a box of ammunition. He then returned to the counter and said he wanted to buy a Uzi. Georgianna said it would have to be ordered but defendant said no, he wanted it now, he did not want to wait. Georgianna referred defendant to the manager, Moran. Moran told defendant it would take a week or more to get a Uzi for him, at a cost of $550. Defendant tried to buy the Uzi he had rented, but was refused; he seemed very tense, and left.

On the same day, defendant visited the Turner Sporting Goods store in Reseda. He asked Turner employee McNeill about buying a Uzi. Not having one in stock, McNeill located one at Turner's Culver City store. He told defendant it would be available in a day or two; they agreed defendant would return for the Uzi on Wednesday, June 26.

Defendant testified he worked at Scaliche's, a restaurant, on June 24 and 25. On Tuesday, June 25, defendant had a conversation with Richard

Phillips, a cook at the restaurant, a place where Steven Redman had also worked. Defendant told Phillips he had a fight at home, had moved out of his house, and was planning to kill his brother. He showed Phillips a truck he had just purchased, in which he planned to live. He told Phillips he had bought a gun. Defendant seemed calm to Phillips, who discounted defendant's stated intention to kill his brother; he concluded only that defendant had been in a family fight, and counseled him that he would get over being upset about it.

Defendant also had a conversation with Kurt Gardner about the same time at Scaliche's. Gardner, aged 18, had worked at Scaliche's with defendant and Redman. Defendant told Gardner he had left home after a fight; he indicated that he had been humiliated by his brother and Steven Redman. He told Gardner he was getting a gun. Gardner, like Phillips, concluded it was a family dispute which would blow over; he suggested that defendant return home. He observed that defendant was angry but did not perceive that his anger was excessive.

On Wednesday, June 26, defendant picked up the Uzi at Turner's. The assistant manager, Salisbury, spent some time with defendant, showing him how to clean the weapon, and discussing its safe operation. Defendant also wanted ammunition, and Salisbury sold him five boxes of ammunition, each containing fifty rounds. Salisbury observed that defendant was nervous, but did not see any display of anger.

On June 27, defendant called Kevin Schmidt and Miles Gordon, both of whom knew Steven Redman. Defendant was trying to find out where Redman lived. Schmidt did not know, but Gordon gave defendant specific directions about how to get to Redman's home in a condominium complex. Defendant had explained to Gordon that he planned to do Steven a favor. Gordon did not pick up anything unusual from defendant's voice.

On Friday morning, June 28, about 6:30, the employee of a dog kennel located at 5340 Las Virgenes Road, Sanchez, observed a red car parked on the road with someone sitting inside. The car and individual were still there at 7:30 or 7:45 a.m., when Sanchez left the kennel. Shortly before 8 a.m., a walker, Ms. De Vane, observed a small sports car parked near the condominium complex located in the 5300 block of Las Virgenes Road. She saw a male seated in the driver's seat. Between 8 and 9 a.m., two joggers, Branch and Robideaux, observed a red Mustang automobile parked near the same condominium complex; the windows were open and the stereo was on; there was a male seated in the car. When the joggers returned, 10 to 20 minutes later, the car was still there.

About 9:30 or 9:40 a.m., a private investigator named Jon Green parked temporarily near the complex so that he could prepare some equipment. He saw a young male seated in the driver's seat of the parked red Mustang. Green drove away, but returned later in the morning, between 10:40 and 10:50 a.m.

Green saw the red Mustang and a Honda, very close together. He saw defendant and Steven Redman standing outside the vehicles, about five to seven feet apart, facing each other. Green testified that they appeared to be talking. Green then saw Steven fall, and realized that defendant had a gun. Defendant walked away from Steven, and got into his car, with the gun still pointed at Steven. Green reported what he had seen at a nearby fire station.

John Walker was also traveling down Las Virgenes Road, between 10 a.m. and noon on June 28. He saw the two cars, and saw defendant get into one of them. He also saw Steven Redman's body lying in the street. Walker followed defendant as he left in his vehicle; Walker thought something was very wrong. Defendant drove his car very fast, with Walker in pursuit. Defendant was at times driving 85 miles per hour on the freeway. Walker got defendant's license number. Defendant exited the freeway on Mulholland Drive; Walker lost him at that point. There was testimony that defendant stopped at a service station on Mulholland and changed a wheel.

That morning Joey received a call at the Rosenkrantz home from defendant. Defendant was crying and told his brother, "I have done something terrible to Steve, and you are not going to see me again." Joey told defendant that he should remember they all loved him. Defendant said he loved them [his family] too.

On the afternoon of June 28, Deputy Sheriff Herbert Wielkie, who lived near Steven Redman, observed Steven's body on Las Virgenes Road. He learned from other deputies what had happened there. Wielkie taught a law course at Calabasas High School; defendant had been a student of his. Wielkie had instructed the class about the various degrees of homicide. He had seen Steven Redman but did not know him personally. On the evening of June 28, at the Agoura sheriff's station, Wielkie was on duty when he received a telephone call from defendant. Wielkie tried to persuade defendant to surrender. This conversation was recorded and was played for the jury; a transcript was also made of the recorded conversation. Defendant wanted to know if Steven was dead; he admitted the shooting. He expressed various attitudes during the conversation with Wielkie, ranging from remorse to defiance. He was fearful that the death penalty would be imposed for his crime.

Steven Redman's body was the subject of autopsy on June 30. The medical examiner, Dr. Sherry, observed at least 10 gunshot wounds in the body, which was 65 inches in length and weighed about 120 pounds. While there were six gunshot wounds to the head, there was some evidence that Redman sustained a chest wound first. There was also evidence that the Uzi had been fired at very close range.

On July 23, 1985, defendant surrendered to the investigating deputy sheriff, Detective McComas, accompanied by his attorney. The defendant's car and the Uzi were turned over to McComas at the same time. Subsequently a ballistics expert determined that the bullets found in Redman's body and the ammunition casings recovered from the scene of the shooting had been fired by defendant's Uzi.

The prosecution also offered the testimony of Robert Klein, an older man who knew Steven Redman because of their mutual interest in jazz. Klein testified that Steven, whom he had known for over a year, was a shy boy and not a violent one.

Defendant testified on his own behalf. He had known at an early age that he was sexually attracted to men rather than women. He also knew that this circumstance was unacceptable to his family, particularly to his father, whom he idolized. He pretended, therefore, to be heterosexual. At 13 years of age, he discovered that he could communicate with other gays via computer. This could be done anonymously. By 17½, he was communicating regularly with other gays, by using a gay bulletin board available by computer. In this way, he met other homosexual teenagers. Defendant was careful to keep these activities secret.

Meanwhile, defendant attempted to mislead his family by expressing interest in girls; he wanted his family to believe he was "normal." He worked at a variety of jobs while in high school. His father had testified that when defendant became a teenager, he kept himself in isolation a great deal. However, defendant did spend some time with Joey and with Steven Redman, because they shared interests in computers and automobiles. Defendant testified that Steven Redman was a bully, and preoccupied with hatred of homosexuals. Defendant's brother Joey did not like homosexuals either.

On the night of his graduation, defendant told his family he was taking a girlfriend to the Hermosa Beach house. Defendant did not know that his brother Joey had been eavesdropping on his telephone calls. After the scene at the beach house with Joey and Steven, defendant was very fearful that his homosexuality would be exposed to his parents, particularly his father. His fear became a reality. He left home after an ugly confrontation with his

father about his sexual preference. Defendant testified that he planned to kill himself when he went to the shooting range on Monday, June 24. He denied that he had told Georgianna that he was familiar with the Uzi. Out on the range, he decided not to kill himself but to use the gun to teach Steven "a lesson." He described himself as angry. He also thought of doing damage to cars belonging to Steven and Joey. He did not remember discussing his plans to do harm to Joey or to Steven with employees at Scaliche's restaurant.

On Wednesday night, June 26, he called Steven Redman but Steven hung up on him. One idea defendant had was to use the Uzi to force Steven to recant what he had told defendant's father about defendant's sexual activities. On cross-examination, defendant admitted that he had again called Steven on Thursday, after he had found out where Steven lived, and had told Steven he would come to that location after Steven had refused to recant his statements about defendant's homosexuality.

Defendant testified he had gone to the condominium complex Thursday night, June 27. He looked for Steven's car but could not find it. He slept in his vehicle in a guest parking area at the condominium that night.

The next morning, defendant continued to wait for Steven outside the complex. He called Steven about 7 a.m. from a pay phone and told him he wanted to talk to him. Steven did not want to talk and refused to meet defendant. When Steven came out of the complex, defendant stopped him in his Honda. Steven got out of his car and asked defendant what he wanted.

According to defendant, defendant then got out of the car holding the Uzi which was loaded and ready to shoot; he declared "I think you know what I want." Steven addressed defendant as a "faggot" and told him he was in a lot of trouble. Defendant testified that he asked Steven to come home with him and take back what he had said.

Defendant also testified that Steven reached out and touched the gun, probably to determine if it was real. Defendant told Steven the gun was real. He repeated his demand that Steven accompany him home. Steven said, "I'm not going anywhere with you, you goddamn faggot." Steven asked defendant what he was going to do with the gun. Defendant said he was going to take Steven's car apart. Steven repeated that he was not going to go anywhere with defendant, and defendant pulled the gun away, pointed it at Steven and began shooting. As he shot, he thought "I'm not a faggot" and was aware he was very angry.

After he left the scene, defendant went to various towns in northern California and Oregon. He spent some time with friends, most of whom

were gay. He returned to Los Angeles once but left again. He surrendered to McComas approximately one month after the crime.

The defense presented the testimony of Dr. Terry Gock, a clinical psychologist, who conducted six interviews with defendant, spoke with other family members, and also reviewed police reports and defendant's tape-recorded telephone conversation with Deputy Sheriff Wielkie. Dr. Gock administered psychological tests to defendant, whom he found to have average intelligence. Dr. Gock testified that in his opinion defendant had paid a high price in concealing his homosexuality from his family and friends; the situation had caused stress, isolation and low self-esteem. The dramatic disclosure of defendant's homosexuality, and his father's reaction to it, had produced a very high level of emotional trauma in defendant.

Dr. Gock diagnosed defendant as having an "adjustment disorder with mixed emotional feature, severe." However, he also testified that a person could be experiencing an adjustment disorder and still be in contact with reality, and have no impairment of intellectual capacity. He believed that defendant's reasoning ability was "obscured and disturbed" by the intensity of his feelings on the morning of June 28 when he met Steven on Las Virgenes Road.

Defendant was also examined by psychiatrist Ronald Markman, M.D., who testified at trial. Markman found evidence some six months after the killing of "clear, emotional turmoil." Markman offered various diagnostic possibilities concerning defendant: (1) Either a gross stress reaction or a post-traumatic stress syndrome; (2) "Egodystonic homosexuality," i.e., a state of sexual preference maintained with intense conflict, in that defendant consciously found his homosexuality unacceptable to himself but was compelled to act upon it anyway; and (3) continuing ongoing stress, both before and after the killing, which produced considerable confusion. Dr. Markman testified that in his opinion defendant had not been and was not now psychotic, but that there had been a breakdown in his thinking processes. He did not believe that defendant had planned to kill Steven Redman during the week prior to the crime. He thought it likely that defendant's rationality had been affected by intense emotions during the week prior to the crime, and most particularly when he confronted Steven on Las Virgenes Road the morning of June 28.

Defense counsel specifically asked Dr. Markman the following question: "At the time he shot Steven Redman, when he pulled the trigger after hearing the words (i.e., faggot, etc.), is it your opinion Robert intended to kill Redman at that time?" Dr. Markman responded, "That's a difficult question, counsel, I would go so far as to say it's my opinion he intended to

hurt him. Did he intend to snuff his life out and destroy him at that point in time? It may well have existed, yes."

At another point, Dr. Markman was asked, "When you were asked by the District Attorney if this was a revenge killing or retribution killing, can a killing of that nature involve tremendous passion?" He responded, "Absolutely. Revenge I think implies that."

The prosecution, on rebuttal, presented the testimony of Dr. Jay Ziskin, a clinical psychologist and also the holder of a law degree. Ziskin criticized the present techniques employed by both psychiatrists and psychologists for diagnosing mental illness. He noted that these professionals changed diagnostic definitions frequently, as evidenced by the Diagnostic and Statistical Manual of Mental Disorders, third edition. He noted that in a study concerning the prediction of dangerousness and violence, the participating psychiatrists were found to be nearly always wrong. He questioned whether any clinical psychologist or psychiatrist could accurately assess an individual's present or past mental state. He testified also concerning the factors which might adversely affect an evaluator's accuracy in the forensic arena where a defendant is in custody and is facing a criminal trial.

As indicated, defendant was found guilty of second degree murder by the jury.

## ISSUES

On appeal defendant contends (1) that the trial court committed instructional error which necessitates reversal of the conviction of second degree murder; (2) and that defendant's conviction of second degree murder should be reduced to voluntary manslaughter because there was insufficient evidence to support the conviction of second degree murder and because the sentence for second degree murder is disproportionate to defendant's culpability. We address these issues seriatim.

## DISCUSSION

### I

Defendant first contends that the trial court committed instructional error in this case.

■ As was explained in *People* v. *Wickersham* (1982) 32 Cal.3d 307, 323 [185 Cal.Rptr. 436, 650 P.2d 311], the trial court must "fully instruct the jury on the law applicable to each particular case." It is well established

that "in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." (*People* v. *St. Martin* (1970) 1 Cal.3d 524, 531 [83 Cal.Rptr. 166, 463 P.2d 390].)

■ It is, of course, always the responsibility of the prosecution to prove the elements of a criminal offense beyond a reasonable doubt, including the requisite mental state, and while there is some doubt presently concerning the introduction of evidence negating a defendant's capacity to form a mental state due to mental disease, mental defect, or mental disorder, Penal Code section 28, subdivision (a) provides, in pertinent part, that "Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged."

As a matter of defense, diminished capacity has been abolished. (Pen. Code, § 25.)

In the case at bench, defendant was charged with murder and the jury was instructed on first degree murder, second degree murder, and voluntary manslaughter, i.e., "the unlawful killing of a human being without malice . . . upon a sudden quarrel or heat of passion." (Pen. Code, § 192.) The record makes clear that the defense strategy was to persuade the jury that defendant had committed voluntary manslaughter as defined above.

When jury instructions were discussed by court and counsel, defense counsel conceded that instructions on involuntary manslaughter were inapposite. Defense counsel also rejected the giving of CALJIC No. 3.36 (1981 rev.), which instructed the jury that evidence admitted negating a requisite mental state (i.e., an element of the charged offense) could only be considered by them "for the purpose of determining whether or not the defendant actually formed the mental state which is an element of the crime charged. . . ." Defense counsel declared that he did not wish the instruction given because he regarded it as unduly restrictive, and desired the jury to consider "mental states" in a broader context. Defense counsel argued to the jury that of all the crimes of which defendant could be convicted—all of which required proof beyond a reasonable doubt of specific intent to kill—voluntary manslaughter was the appropriate verdict because, while defendant entertained the requisite intent, the killing was done without either express or implied malice.

During its deliberations, the jury asked the trial judge for amplification of the instructions on malice, and was referred back to the instructions previously given. The jury then unanimously agreed on the second degree murder verdict.

■ On appeal, defendant complains that the trial court gave no instruction on what he terms "diminished mental state," and argues that this failure to instruct constituted reversible error. Respondent Attorney General asserts that defendant did not present a defense at trial based on "diminished mental state," primarily because the evidence adduced below, including the expert evidence offered by the defense concerning defendant's mental state, did not support it.

■ It is also well established that "the duty to give instructions, *sua sponte,* on particular defenses and their relevance to the charged offense arises only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case. Indeed, this limitation on the duty of the trial court is necessary not only because it would be unduly burdensome to require more of trial judges, but also because of the potential prejudice to defendants if instructions were given on defenses inconsistent with the theory relied upon." (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 716 [112 Cal.Rptr. 1, 518 P.2d 913].)

■ We agree with respondent that the evidence in the record did not support a "diminished state of mind" theory, assuming that theory relates to capacity to form the specific intent element of various kinds of homicide.

While both Drs. Gock and Markman agreed that defendant's reasoning ability was adversely affected by acute emotional disturbance for at least a week before the crime, neither expert was prepared to state that defendant did not have the capacity to form specific intent to kill; although Dr. Gock's testimony was not as clear on this point, Dr. Markman particularly refused to characterize defendant as either psychotic or upset to the point he could not form specific intent; no particular mental disease, defect or disorder was identified as having had that effect.

What the defense experts did testify to was their belief that the defendant's reasoning was " 'so disturbed or obscured by some passion . . . to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' " (*People* v. *Valentine* (1946) 28 Cal.2d 121, 139 [169 P.2d 1]; *People* v. *Berry* (1976) 18 Cal.3d 509, 515 [134 Cal.Rptr. 415, 556 P.2d 777].) Thus the experts were directing their testimony toward

the mental state that forms the basis for a finding of voluntary manslaughter. No objection has been made here that the instructions on voluntary manslaughter were less than complete.

On appeal the argument is now made, in effect, that the defense took too narrow a view of the evidence and should not have conceded that defendant acted intentionally at all, but rather was so deranged that his capacity to form the requisite intent to kill was actually in issue. This is the kind of "second-guessing" deplored in *Strickland* v. *Washington* (1984) 466 U.S. 668, 689 [80 L.Ed.2d 674, 694, 104 S.Ct. 2052], and it may not be used on this appeal to secure a reversal on either (1) failure to instruct or (2) by inference, inadequate trial representation of defendant. A fair reading of the entire record discloses a solid defense presented by a more than adequate trial counsel. The jury apparently concluded that a person of average disposition would not have been provoked to the point this particular defendant was by the attendant circumstances, and rejected the defense theory.

Since we take the view that the evidence did not raise the issue of "diminished state of mind" as we understand that term, the trial court had no duty to instruct upon it sua sponte. ■ Respondent Attorney General also contends that the trial court's refusal to instruct constituted "invited error," and seeks to invoke the principle that an accused may not gain a reversal on appeal because of an error made by the trial court at his behest when such occurs for strategic reasons clearly expressed on the record. (*People* v. *Wickersham, supra,* 32 Cal.3d 307, 330; *People* v. *Graham* (1969) 71 Cal.2d 303 [78 Cal.Rptr. 217, 455 P.2d 153].) Specifically, it is argued that since defendant's trial counsel rejected the giving of the "diminished state of mind" instruction, defendant should not be allowed to complain of it here.

It is true, as defendant points out, that trials are not "gambles" in the truest sense of that word. However, defendant's trial counsel was entirely consistent in rejecting the giving of CALJIC No. 3.36. He did not want the jury's attention diverted from the "mental state" theory which forms the foundation for voluntary manslaughter. His thought is sufficiently well expressed in this record to attribute his rejection of the instruction to strategy. In any event, these instructional issues really turn on the fact that the evidence adduced below did not raise the issue of "diminished state of mind" as we understand that term, and thus no "invited error" appears.

Defendant further contends that the jury was not instructed properly on malice aforethought, either express or implied. The record shows that the jury was instructed that in order to convict defendant of murder it must find an unlawful killing done with malice aforethought (CALJIC No. 8.10); express malice was defined for the jury as "an intention unlawfully to kill a

human being." (CALJIC No. 8.11.) The jury was additionally told that an unlawful killing is voluntary manslaughter rather than murder if the defendant acted "without malice aforethought when there is an intent to kill." The trial court explained to the jury at that point that "there is no malice aforethought if the killing occurred upon a sudden quarrel or heat of passion."

Defendant argues that these instructions are confusing, and did in fact confuse this jury because the instructions did not adequately distinguish a killing with malice from voluntary manslaughter. Defendant has not referred to the trial court's effort to clarify the confusion, if any. During the jury instructions, the judge advised the jury that voluntary manslaughter did not require proof of malice aforethought beyond a reasonable doubt, and that was what distinguished it from murder. We find no error in the instructions given on express malice. Penal Code section 188, as revised by the Legislature in 1981 and 1982, no longer includes in the definition of malice a decision by a defendant to act despite awareness of a duty to conform to the law. Defendant maintains that instructions on express malice must still emphasize defendant's awareness of the illegality of his conduct, but the revisions do not include it. It remains to be seen if the revisions are so interpreted by our Supreme Court. (*People* v. *Croy* (1985) 41 Cal.3d 1, 18-19, fn. 12 [221 Cal.Rptr. 592, 710 P.2d 392]).

Defendant also claims that the instruction given on implied malice was erroneous and prejudicial to the defendant. The jury was instructed by the first paragraph of CALJIC No. 8.11 that "[m]alice is implied when the killing results from an intentional act involving a high degree of probability that it will result in death, which act is done for a base antisocial purpose and with a wanton disregard for human life." An alternative definition was not given, which provides, "or when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." (A number of Court of Appeal decisions, now unpublished, have questioned the use of alternative instructions, but in this case the second part was not given.) We agree with respondent Attorney General that the first paragraph adequately informs the jury that, contrary to defendant's assertion, implied malice involves a *subjective* factor which must be assessed by the jury in determining the defendant's state of mind at the time of the crime. (*People* v. *Watson* (1981) 30 Cal.3d 290, 300 [179 Cal.Rptr. 43, 637 P.2d 279].)

## II

Defendant contends that there was insufficient evidence to establish that defendant committed second degree murder because the prosecution

failed to prove the existence of malice aforethought beyond a reasonable doubt.

Penal Code section 187 defines murder as the unlawful killing of a human being . . . with malice aforethought. After delineating those types of murder which are first degree, i.e., "willful, deliberate and premeditated" killings, Penal Code section 189 declares that all other murders are of the second degree. Penal Code section 188 defines such malice as "express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned or malignant heart."

We have already set forth the standard of review which governs when a defendant argues that the evidence is insufficient to support conviction of the crime charged.

■ The existence of malice, like any other question of fact, must be proved by the prosecution beyond a reasonable doubt by solid, credible evidence. ■ There was ample solid, credible evidence before this jury that defendant had entertained the intent to kill the victim during the week before the crime. Defendant's conduct in arming himself with a semi-automatic weapon after practicing its use on a shooting range, his statements to others, his successful attempt to locate the victim's residence, and his confrontation of the victim outside that residence after waiting there for many hours would have supported a conviction of premeditated first degree murder.

It is also clear, however, that the jury determined that due to the circumstances surrounding the killing there was reasonable doubt that defendant did in fact plan to kill Steven Redman before the shooting. Consequently the jury determined that the evidence was "insufficient to establish deliberation and premeditation." (CALJIC No. 8.30.)

We agree with defendant that the primary issue the jury had to determine was not the existence of deliberation but the existence of malice aforethought. More specifically, the jury had to determine whether or not defendant had been sufficiently provoked to negate the existence of such malice. The jury concluded that defendant had not been so provoked as to provide either an explanation or justification for why he conducted himself as he did, shooting his victim many times at close range. In view of the evidence adduced below, we cannot say that it was insufficient to support conviction of the "unlawful killing of a human being, with malice aforethought."

 Finally, defendant contends that the sentence imposed, 15 years to life, is unconstitutionally disproportionate to his individual culpability. Disproportionate sentencing, as well as cruel and inhuman punishment, is prohibited by the Eighth Amendment, United States Constitution, and by article I, section 17 of the California Constitution. As was explained in *In re Lynch* (1972) 8 Cal.3d 410, 424 [105 Cal.Rptr. 217, 503 P.2d 921], even though a punishment may not be cruel or unusual, it may violate this constitutional prohibition if "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (Fn. omitted.)

*Lynch* adopted a three-pronged analysis in assessing whether a defendant had been sentenced in a disproportionate manner. As described in *In re Foss* (1974) 10 Cal.3d 910, 919-920 [112 Cal.Rptr. 649, 519 P.2d 1073], the analysis involves "an examination of the nature of the offense and/or the offender, with particular regard to the degree of danger both present to the society[;]" "a comparison of the questioned punishment with punishments imposed within the same jurisdiction for offenses which may be deemed more serious than that for which the questioned punishment is imposed[;]" and "a comparison of the challenged penalty with punishments prescribed in other jurisdictions for the same offense." Since California has adopted a determinate sentencing law, the present inquiry in disproportionality cases "focuses on the individual defendant, as well as [his] crime." *People* v. *Almodovar* (1987) 190 Cal.App.3d 732, 747 [235 Cal.Rptr. 616], cert. den. *Almodovar* v. *California* (1987) 484 U.S. 946 [98 L.Ed.2d 362, 108 S.Ct. 335].)

 The obvious and troubling issue of disproportionality presented in the case at bench is that the defendant was only 18 years of age at the time of the offense. He argues that, like the 17-year-old boy in *People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697], he is entitled to a modification of the sentence imposed upon him. Despite the similarity in the ages of these two defendants, the defendant herein and the *Dillon* defendant, the circumstances of their crimes were very different. In *Dillon,* the defendant, along with others, conducted an armed raid on a marijuana field, and when the group encountered armed defenders, defendant, in a moment of panic, shot and killed one of the armed defenders. He was convicted of first degree murder pursuant to the felony-murder rule, and sentenced to life imprisonment. There was evidence that Dillon was immature for his age and the entire circumstances strongly suggested the absence, at the very least, of malice.

Defendant herein was a relatively sophisticated high school graduate. We are not persuaded that defendant's response could be categorized as a

typical or foreseeable one, given the attendant circumstances. The jury was unable to accept the premise that defendant reacted to circumstances arousing a passion which "would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection and from such passion rather than from judgment." (CALJIC No. 8.42.) We believe the jury verdict was a correct assessment of the crime, despite the defendant's age. We can find no circumstances that persuade that the defendant has been punished in a disproportionate manner, given the fact that he took the life of an equally young man. While defendant will serve substantial time in prison, he has deprived his young victim of the balance of his life.

## DISPOSITION

The judgment is affirmed.

Spencer, P. J., and Devich, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 9, 1988.