116 Cal.Rptr.2d 69 (2002)
95 Cal.App.4th 358
In re Robert ROSENKRANTZ, on Habeas Corpus.
No. B151016.
Court of Appeal, Second District, Division One.
January 18, 2002.
Review Granted May 1, 2002.
*72 Rowan K. Klein and Donald Specter, Prison Law Office, San Quentin, for Petitioner.
Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Paul D. Gifford, Senior Assistant Attorney General, and Robert D. Wilson, Deputy Attorney General, for Respondent.
MIRIAM A. VOGEL, J.
Robert Rosenkrantz was convicted of murder and sentenced to prison for an indeterminate term of 15 years to life, plus 2 years for his use of a gun. The second time the Board of Prison Terms considered his suitability for parole, the hearing panel found he was suitable and fixed his parole date. That decision was reversed by the Board's Decision Review Unit, and a series of parole hearings held over a period of several years resulted in one denial after another. Ultimately, Rosenkrantz filed a petition for a writ of habeas corpus. Hearings were held in the superior court, and findings were made that there was no evidence to support the Board's decision. We affirmed, another hearing was held, and the matter was ultimately sent to the Governor. The Governor reversed the Board's decision. Rosenkrantz then amended his habeas petition, claiming there was no evidence to support the Governor's decision and that the Governor's decision was a product of the Governor's "no parole" policy, not an individualized determination of Rosenkrantz's suitability for parole. More hearings were held, and the amended petition was granted. The Governor appeals, contending the superior court had no jurisdiction to review his decision but that, if there is to be some judicial review, it must be based entirely on the Governor's statement of decision.
*73 We conclude that Rosenkrantz's liberty interest in his statutory right to be considered for parole conferred jurisdiction on the superior court to review the Governor's decision and the underlying record for some evidence in support of the Governor's decision and for the due process violations asserted by Rosenkrantz. We conclude also that the Governor's review of the Board's parole decision had to be based on the evidence that was before the Board and on the same factors the Board was required to consider. We hold that our decision on the second of three prior appealswhere we found that there was not any evidence to support the Board's unsuitability findingis the law of this case and binding on the superior court and on this appeal. We affirm the trial court's order.

BACKGROUND
In 1986, Robert Rosenkrantz was convicted of second degree murder, with a gun use allegation found true. He was sentenced to state prison for a term of 15 years to life, plus 2 years for his use of a gun. We affirmed the judgment. {People v. Rosenkrantz (1988) 198 Cal.App.3d 1187, 244 Cal.Rptr. 403 [Rosenkrantz I]); see also In re Rosenkrantz (2000) 80 Cal. App.4th 409, 95 Cal.Rptr.2d 279 [Rosenkrantz II]; Davis v. Superior Court (Rosenkrantz) (Feb. 22, 2001, No. B146421 [nonpub. opn.] [Rosenkrantz III].].) Read together, Rosenkrantz I, Rosenkrantz II, and Rosenkrantz III provide the details of the crime, Rosenkrantz's conduct while incarcerated, and Rosenkrantz's efforts to gain parole between 1996 and September 2000. In the following paragraphs, we summarize those facts and then describe the subsequent events leading to this appeal.
In 1994, the Board of Prison Terms set Rosenkrantz's minimum parole eligibility date as January 23, 1996. (Pen.Code, §§ 3040, 3041.)[1] At a parole suitability hearing held in June 1996, the Board's hearing panel found Rosenkrantz suitable for parole and recommended a release date, but the Board's Decision Review Unit disapproved that recommendation and no parole date was set. At hearings held in December 1996, August 1997, and August 1998, the Board found Rosenkrantz was not suitable for parole. (Rosenkrantz II, 80 Cal.App.4th at pp. 413-419, 95 Cal. Rptr.2d 279.)
In 1998, Rosenkrantz filed a petition for a writ of habeas corpus in which he sought review of several of the parole suitability decisions. In April 1999, the superior court (Hon. Kathryne Ann Stoltz) granted Rosenkrantz's petition and directed the Board to set a parole date commensurate with Rosenkrantz's conviction of second degree murder"`[u]nless there [were] changed circumstances or new information . . . that was not previously presented to the Board.'" (Rosenkrantz II, 80 Cal. App.4th at p. 421, 95 Cal.Rptr.2d 279.) The Board appealed and requested a stay, which we denied, and the Board held a new suitability hearing on September 9, 1999. At that hearing, the panel found Rosenkrantz unsuitable for parolebut granted a parole date in order to comply with the trial court's order. In November 1999, the Governor (noting that the suitability finding was "`based solely'" on an order that was then pending on appeal) "`invoked his authority to reverse the Board's decision to grant parole.'" (Id, at pp. 421-422, 95 Cal.Rptr.2d 279; see also Cal. Const., art. V, § 8; § 3041.2.)
On the Board's appeal (and consolidated petition for a writ of mandate), we held (in April 2000) that "the September 9, 1999, *74 finding of unsuitability is unsupported by any evidence and that the [hearing] panel's decision [could not] stand." (Rosenkrantz II, 80 Cal.App.4th at p. 427, 95 Cal.Rptr.2d 279.) We affirmed, and ordered the Board "to schedule and commence a new suitability hearing within 30 days of the date [our] opinion [was] filed." (Rosenkrantz II, 80 Cal.App.4th at p. 429, 95 Cal.Rptr.2d 279.) At the Board's request, we extended the time for compliance, and a new suitability hearing was held on June 30, 2000. No new evidence was presented, only new arguments. At the conclusion of the hearing, the hearing panel announced its finding that Rosenkrantz was "suitable for parole and would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison." The hearing panel found that Rosenkrantz had committed his crime as the result of "significant stress" in his life, that he showed remorse and had accepted responsibility for his crime, and that his most recent psychological report demonstrated that he was "a very low risk for future violence" and "clearly not a criminally oriented individual."
In September 2000, the superior court ordered Rosenkrantz's immediate release on parole. Anticipating the Board's application to us for a stay, the superior court ordered that, "[i]f a stay of the order granting [Rosenkrantz's] immediate release on parole should be granted by another court," some technical issues were to be resolved and the Board was to complete its decision review process and transfer the case to the Governor within 10 working days after the issuance of the stay. As anticipated, we stayed the order for Rosenkrantz's immediate release. By the end of September, the Board complied with the superior court's orders and transferred the case to the Governor.
On October 28, 2000, the Governor reversed the Board's June 30 finding of suitability. (Cal. Const., art. V, § 8(b); § 3041.2.) In his 12 page decision, the Governor summarized the facts of the crime and Rosenkrantz's fugitive status during the 24 days following the murder. The Governor concluded that Rosenkrantz had "brutally murdered his victim," that his "crime demonstrates his dangerous potential for violence," and that his "conduct subsequent to the crime also demonstrates his dangerous potential for violence." The Governor said he was "not convinced that Mr. Rosenkrantz committed this murder in the heat of passion or under stress significant enough to offset the serious nature of this crime," and that although Mr. Rosenkrantz now professes remorse, he had "never fully taken responsibility for his crime." With regard to Rosenkrantz's years in prison, the Governor had this to say: "Although Mr. Rosenkrantz has been discipline free and continued his education while in prison, the State of California expects this of all prisoners." The Governor advised Rosenkrantz to "be grateful that he was not convicted of first degree murder." In short, it was the Governor's "considered judgment that the gravity of Mr. Rosenkrantz' offense and his repeated attempts to minimize the culpability evidence [made Rosenkrantz] a continued threat to the public requiring that he remain incarcerated."
In November 2000, Rosenkrantz filed an amended petition for a writ of habeas corpus in which he challenged the Governor's decision to reverse the Board's decision. In response, the Governor filed a peremptory challenge, claiming that Judge Stoltz was biased against him. (Code Civ. Proc., § 170.6.) Judge Stoltz struck the challenge as untimely. The Governor appealed. We reversed and ordered the superior court to transfer the cause to another judge. (Rosenkrantz III, Supra, B146421.)
*75 On remand, the superior court (Hon. Paul Gutman) issued an order to show cause and set a briefing schedule. In April 2001, the Governor filed his return to the amended petition. Rosenkrantz filed his traverse in May. Evidentiary hearings were held in May and June, after which the superior court granted the petition and ordered Rosenkrantz "released from custody on parole forthwith." Among other things, the superior court found that habeas corpus was "a proper remedy to test the propriety of the review by the Governor," that "due process requires that there be some evidence to support a reversal of parole by the Governor," that the "materials reviewed by the Governor" included "no evidence supporting a denial of parole" and that, therefore, Rosenkrantz's "right to due process was violated when the Governor reversed the decision of the [Board] granting parole."
As an alternative basis for its order, the superior court also found that Rosenkrantz "was denied an individualized determination of his suitability for parole; that the Governor's policy of denial of parole to term-to-life convicts is unlawful; that the Governor's no parole policy denied [Rosenkrantz] due process in violation of Federal and State due process clauses; that the Governor's no parole policy is demonstrative of an actual bias against an entire class of cases that the Governor is charged with adjudicating; that such a policy results in prejudgment of all murder cases (but one) coming before him, thereby depriving [Rosenkrantz] of his right to an impartial decision maker and, thus, that [Rosenkrantz] is being confined beyond his lawfully set parole date of March 30, 2000."
On June 22, 2001, the Governor filed a notice of appeal and a request for a stay of the superior court's order for Rosenkrantz's release. On the same day, we denied the request for a stay, but the Supreme Court intervened and stayed the order pending our final determination of the Governor's appeal. At Rosenkrantz's request, we expedited the appeal.

DISCUSSION
The Governor contends his decision to deny parole is not reviewable on its merits but that, if it is, his decision is supported by "some evidence." Based on the California Constitution and the law of the case doctrine, we disagree.

A.
The California Constitution grants the State's "supreme executive power" to the Governor. (Cal. Const., art. V, § 1.) Until 1988, that power did not include the authority to make the final decision about any prisoner's parole, only the right to grant a reprieve, pardon or commutation of sentence. (Cal. Const., art. V, § 8(a); § 3040 [the Board of Prison Terms has the power to allow prisoners to go upon parole]; In re Powell (1988) 45 Cal.3d 894, 901, 248 Cal.Rptr. 431, 755 P.2d 881 [all parole decisions were exclusively within the province of the Board, an administrative agency created by the Legislature and authorized to grant parole and fix release dates].) But in November 1988, the electorate approved an initiative (Proposition 89) that added section 8(b) to article V of the California Constitution to divest the Board of Prison Terms of the sole responsibility for deciding whether incarcerated murderers are suitable for parole by giving the Governor the power to "affirm, modify, or reverse" the Board's parole decision concerning any murderer sentenced to prison for an indeterminate term. (Cal. *76 Const., art. V, § 8(b).)[2] The initiative removed the "final parole decisionmaking authority from the [Board] and place[d] it in the hands of the [G]overnor." (Johnson v. Gomez (9th Cir.1996) 92 F.3d 964, 967.)[3]
Before and after the adoption of Proposition 89, the Governor had and has the power to request review of any parole decision made by the Board. (§ 3041.1.) After the adoption of Proposition 89, the Legislature enacted section 3041.2 to provide: "(a) During the 30 days following the granting, denial, revocation, or suspension by a parole authority of the parole of a person sentenced to an indeterminate prison term based upon a conviction of murder, the Governor, when reviewing the authority's decision pursuant to subdivision (b) of Section 8 . . ., shall review materials provided by the parole authority. [¶] (b) If the Governor decides to reverse or modify a parole decision of a parole authority pursuant to subdivision (b) of Section 8 . . ., he or she shall send a written statement to the inmate specifying the reasons for his or her decision." (Stats. 1988, ch. 1626, § 2.)
A few years after the adoption of Proposition 89, the Third District of our court explained that "[although neither section 8(b) nor . . . section 3041.2 expressly states the Governor's review is limited to a consideration of the record before the hearing panel, such a limitation is implicitly conveyed by the common meaning of the term `review,' particularly when that term is used as here, in juxtaposition to an express reference in the statute to materials provided for the Governor's review by the parole authority. In its usual construction, `"review indicates simply a re-examination of proceedings already had" without the taking of any new evidence' . . .; i.e., an examination of the same record by a different tribunal." (In re Arafiles (1992) 6 Cal.App.4th 1467, 1477, 8 Cal.Rptr.2d 492.)
Read together, section 8(b) and section 3041.2 make it clear that the Governor's review of the Board's decision in this case must be based upon the same factors (Johnson v. Gomez, supra, 92 F.3d at p. 967) and the same evidence (In re Arafiles, supra, 6 Cal.App.4th at p. 1477, 8 Cal. Rptr.2d 492) considered by the Board of Prison Terms. (And see In re Ramirez (2001) 94 Cal.App.4th 549, 559-60, 114 Cal. Rptr.2d 381[the "Governor is authorized to override the Board's parole decisions, but he is constitutionally required to make his decisions `on the basis of the same factors *77 which the parole authority is required to consider' [and] the executive branch does not have the kind of virtually unlimited discretion over parole matters that it has over reprieves, pardons, and commutations"].)

B.
The Governor contends his parole decisions under section 8(b) are not reviewable by the courts, and that he has satisfied his constitutional and statutory obligations when he conducts his review within the required time, reports his decisions to the Legislature, provides the prisoner with a statement of reasons for his decision, and makes his decision "on the basis of the same factors which the parole authority is required to consider." According to the Governor, the "[f]ulfillment of these requirements establishes that the prisoner's parole request has been given due consideration." In short, the Governor says it is a separation of powers issue. We disagree.

1.
Section 3 of article III of the California Constitution provides that "[t]he powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution." Although this separation of powers doctrine "limits the authority of one of the three branches of government to arrogate to itself the core functions of another branch," the doctrine also "recognizes that the three branches of government are interdependent and it permits actions of one branch that may `significantly affect those of another branch.'" (Carmel Valley Fire Protection Dist. v. State of California (2001) 25 Cal.4th 287, 297-298, 105 Cal.Rptr.2d 636, 20 P.3d 533, italics added; see also Solberg v. Superior Court (1977) 19 Cal.3d 182, 191, 137 Cal.Rptr. 460, 561 P.2d 1148.) When faced with an encroachment on the power of the executive, the Supreme Court has observed that the "purpose of the doctrine is to prevent one branch of government from exercising the complete power constitutionally vested in another [citation]; it is not intended to prohibit one branch from taking action properly within its sphere that has the incidental effect of duplicating a function or procedure delegated to another branch." (Younger v. Superior Court (1978) 21 Cal.3d 102, 117, 145 Cal.Rptr. 674, 577 P.2d 1014, italics in original.) For these reasons, it is common for the courts to pass upon "the constitutional validity of . . . executive actions.... Such interrelationship, of course, lies at the heart of the constitutional theory of `checks and balances' that the separation of powers doctrine is intended to serve." (Superior Court, v. County of Mendocino (1996) 13 Cal.4th 45, 53, 51 Cal.Rptr.2d 837, 913 P.2d 1046.)

2.
The flaw in the Governor's argument to the contrary is his assumption that, in adopting Proposition 89, the voters elevated the Governor's authority to review parole decisions to an absolute and unreviewable height. There is no support for the Governor's assumption. To the contrary, Proposition 89, which compels the Governor to make his decision "on the basis of the same factors which the parole authority is required to consider" (§ 8(b)), "simply allows for an additional level of discretionary review of parole decisions regarding murderers serving an indeterminate life sentence." (In re Arafiles, supra, 6 Cal.App.4th at pp. 1484-1485, 8 Cal. Rptr.2d 492.) Judicial review by habeas corpus remains available to a life prisoner who wishes to challenge the Governor's decision on the ground that it is arbitrary *78 and capricious. (Id. at p. 1481, 8 Cal. Rptr.2d 492; see also In re Sturm (1974) 11 Cal.3d 258, 269, 113 Cal.Rptr. 361, 521 P.2d 97.) The Governor's discretion is significant, but it is not unlimited. (See Board of Pardons v. Allen (1987) 482 U.S. 369, 375, 107 S.Ct. 2415, 96 L.Ed.2d 303; and see In re Ramirez, supra, 94 Cal. App.4th at p. 560, 114 Cal.Rptr.2d 381.)
The Governor's references to the ballot arguments in support of Proposition 89 add nothing. The official title and summary prepared by the Attorney General and the analysis by the Legislative Analyst accurately described the constitutional amendment, with the latter making it clear that the Governor "could consider only that information which the Board of Prison Terms and the Youthful Offender Parole Board are required to consider in making their parole decisions." (Ballot Pamphlet, Gen. Elec. (Nov. 8, 1988) argument in favor of Prop. 89.) According to the ballot argument in favor of Proposition 89, the measure was "based on a simple premise namely, that the public has a right to be protected against the early release of murderers from state prison by having as much scrutiny and as many levels of examination as possible before a convicted murderer is paroled." (Ibid., italics added.) While the arguments refer to the "power" granted to the Governor by Proposition 89, there is nothing in the ballot pamphlet to support the Governor's suggestion that the electorate intended to confer upon him the sort of unfettered discretion that is not reviewable by the courts.
As Division Three of the First District has explained in a strikingly similar context, "[t]he voters who approved . . . section 8, subdivision (b) . . ., and the Legislature which amended . . . section 3041 . . . clearly contemplated that the executive branch's exercise of its broad discretion over parole decisions would conform with factors prescribed by law. The statutory factors are not subject to unilateral revision by each succeeding administration. By way of contrast, we note Maryland's high court has held that Maryland's governor could properly adopt a policy denying parole to all life term inmates except the very old or terminally ill, because Maryland law did not require the governor to base his parole review decisions on any particular factors. (Lomax v. Warden (1999) 356 Md. 569, 741 A.2d 476.)" (In re Ramirez, supra, 94 Cal.App.4th at p. 560, 114 Cal.Rptr.2d 381.)[4]

3.
To avoid this conclusion, the Governor points to a statement in In re Arafiles, supra, 6 Cal.App.4th at page 1479, 8 Cal. Rptr.2d 492, and insists it supports his claim that his "parole review power calls for inherently executive judgment which is `entirely discretionary.'" The Governor is mistaken. While his decision to undertake review of a particular parole decision is "entirely discretionary," his actual review of the case is not. As In re Arafiles explains, "[n]either section 8(b) nor . . . section 3041.2 says anything about what the Governor may consider in deciding whether to exercise his discretionary power to review a parole decision. The reason for the lack of any such direction is obvious: the Governor's exercise of the power to review parole decisions is entirely discretionary. . . . [¶] However, . . . the Governor's review itself, as distinguished from his decision to review, is *79 limited to the administrative record and his decision must be based on the same factors which the hearing panel must consider in arriving at its parole decision." (In re Arafiles, supra, 6 Cal. App.4th at p. 1479, 8 Cal.Rptr.2d 492, emphasis added; see also Jenkins v. Knight (1956) 46 Cal.2d 220, 223, 293 P.2d 6 [the Governor is not exempted from judicial process solely because he is the chief executive].) The fact that the Governor may come to a different conclusion than the Board about a prisoner's suitability for parole does not mean the Governor's discretion is absolute or unreviewable. Just as the "Board's discretion over parole suitability decisions is neither unlimited nor immune from judicial review" (In re Ramirez, supra, 94 Cal.App.4th at p. 560, 114 Cal.Rptr.2d 381), so too is the Governor's discretion.

4.
For similar reasons, we reject the Governor's assertion that his parole review powers are "committed exclusively to [him]" because they are "comparable to his clemency powers under article V, section 8(a)."[5] Although the Governor's clemency powers are essentially absolute and rarely, if ever, subject to judicial review (Connecticut Board of Pardons v. Dumschat, supra, 452 U.S. at p. 466, 101 S.Ct. 2460; Way v. Superior Court (1977) 74 Cal. App.3d 165, 176, 141 Cal.Rptr. 383), the differences between the Governor's power to review the Board's decisions and his unilateral power to grant clemency are apparent. Except in cases of impeachment and as otherwise provided in the Constitution, section 8(a) confers upon the Governor the sole right to grant reprieve, pardon, or commutation "on conditions [he] deems proper." There are no limits imposed on the Governor's decision-making process, or on the procedure used to make his decision, or on the evidence to be considered, or on the evidence to be applied. His discretion is "unfettered." (See Connecticut Board of Pardons v. Dumschat, supra, 452 U.S. at p. 466, 101 S.Ct. 2460; Board of Pardons v. Allen, supra, 482 U.S. at pp. 375-376, 107 S.Ct. 2415.)
Under section 8(b), the Governor has equally unfettered discretion to decide whether to review a parole decision, with no limits imposed by the Constitution. (In re Arafiles, supra, 6 Cal.App.4th at p. 1479, 8 Cal.Rptr.2d 492.) In the context of Rosenkrantz's case, that means the courts should not and will not consider the propriety of the Governor's decision to review the Board's suitability decision. (Jenkins v. Knight, supra, 46 Cal.2d at pp. 222-223, 293 P.2d 6.) But once the Governor exercises his discretion in favor of review, the Constitution imposes on him the duty (1) to act within 30 days, (2) in the manner provided by statute, and (3) to base his decision whether to affirm, modify, or reverse the decision of the Board only "on the basis of the same factors which the parole authority is required to consider." (§ 8(b); see also In re Arafiles, supra, 6 Cal.App.4th at pp. 1478-1479, 8 Cal. Rptr.2d 492.) And when the Governor reverses the Board's finding, he must send the prisoner a written statement of his reasons (§ 3041.2, subd. (b)), the plain purpose *80 of which is to permit the prisoner to obtain meaningful judicial review. (In re Sturm, supra, 11 Cal.3d at p. 267, 113 Cal.Rptr. 361, 521 P.2d 97.) In the context of Rosenkrantz's case, these fetters define the Governor's decision to reverse the Board's suitability finding as an act of judgment by an official in the application of set standards and subject that decision to judicial review. (Board of Pardons v. Allen, supra, 482 U.S. at pp. 375-376, 107 S.Ct. 2415; In re Arafiles, supra, 6 Cal. App.4th at p. 1481, 8 Cal.Rptr.2d 492; In re Ramirez, supra, 94 Cal.App.4th at p. 560, 114 Cal.Rptr.2d 381 ["the executive branch does not have the kind of virtually unlimited discretion over parole matters that it has over reprieves, pardons, and commutations, which may be granted `on conditions the Governor deems proper'"].)[6]

5.
In addition to the reasons stated above, and "despite the necessarily subjective and predictive nature of the parole-release decision," the Governor's parole decision is subject to judicial review because California's parole statutes create a protected liberty interest. (Board of Pardons v. Allen, supra, 482 U.S. at pp. 371-379, 107 S.Ct. 2415; In re Prewitt (1972) 8 Cal.3d 470, 475-476, 105 Cal.Rptr. 318, 503 P.2d 1326; In re Thomas (1984) 161 Cal. App.3d 721, 732, 206 Cal.Rptr. 719.)
In California, parole must be granted unless certain criteria are met. (§ 3041, subd. (b) [the Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses . . . is such that consideration of the public safety requires a more lengthy period of incarceration]"; In re Ramirez, supra, 94 Cal.App.4th at pp. 564-68, 114 Cal.Rptr.2d 381.) The United States Supreme Court has held that the "structure and language" of parole statutes of this sort (that is, those that provide that a prisoner "shall" be released "unless" some criteria is met, as does the Nebraska statute) create an "expectancy of release" that is "entitled to some measure of constitutional protection." (Greenholtz v. Nebraska Penal Inmates (1979) 442 U.S. 1, 12, 99 S.Ct. 2100, 60 L.Ed.2d 668; accord, Board of Pardons v. Allen, supra, 482 U.S. at pp. 377, 381, 107 S.Ct. 2415; Sandin v. Conner (1995) 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418.) This rule is not ambiguous. As one court put it, "the unique `shall/unless' formula of the Nebraska statute was decisive in Greenholtz. [Citation.] No protected entitlement to release exists unless a state scheme includes that formula." (Baumann v. Arizona Depart, of Corrections (9th Cir.1985) 754 F.2d 841, 844.) In California, it is included in the statute.
The Governor's discretion to review the Board's decision does not affect Rosenkrantz's expectancy of release or his entitlement to some measure of constitutional protection. As explained above, the Governor's discretion is not absolute; it requires the use of judgment in applying the standards set for him by the Constitution and the statute, and it cannot be applied mechanically. (Board of Pardons v. Allen, supra, 482 U.S. at p. 377, 107 S.Ct. 2415.) The United States Supreme Court "determined in Greenholtz that the presence of official discretion in this sense is not incompatible with the existence of a liberty interest in parole release when release is required after the Board determines (in its *81 broad discretion) that the necessary prerequisites exist." (Board of Pardons v. Allen, supra, 482 U.S. at p. 377, 107 S.Ct. 2415, italics omitted.)
In sum, the Governor's decision to reverse the Board's finding of suitability is subject to judicial review.[7]

C.
Having said that the Governor's decision is reviewable, we must consider the scope of that review. In Arafiles, the court held that a life prisoner may challenge the Governor's parole decision as arbitrary or capricious. (In re Arafiles, supra, 6 Cal. App.4th at p. 1481, 8 Cal.Rptr.2d 492.) The Governor does "not believe that this standard affords the degree of deference appropriate under article V, section 8(b)," but contends the "record clearly demonstrates that [his] decision in this case was anything but arbitrary or capricious." The Governor points to his "comprehensive twelve-page Statement of Decision" and contends that its "[n]umerous findings" in themselveswithout reference to the Board's findings or the factors it considered, and without reference to the evidence before the Board and the Governorsupport the Governor's conclusion "that Rosenkrantz is not currently suitable for parole."[8]
In the same vein, the Governor contends the superior court was therefore not entitled to "conduct its own independent review" and that, in "passing upon the weight of the evidence, the superior court exceeded its jurisdictioneven under the `some evidence' standard of reviewbecause the `some evidence' test has never been construed to permit the judiciary to second-guess the merits of parole decisions made by the Board or the Governor." Without "conced[ing] that the `some evidence' test is an appropriate standard for reviewing gubernatorial parole decisions," the Governor contends that, to the extent we relied on the "some evidence" standard in Rosenkrantz II when we affirmed Judge Stoltz's "independent review of the evidence," we were not permitted to do so under the separation of powers doctrine.
The sum and substance of the Governor's argument is that the superior court impermissibly enlarged its scope of review. We disagree. To begin with, the scope of judicial review of the Governor's decision must be sufficient to ensure that Rosenkrantz's due process rights and liberty interests (which as a parole applicant are substantively indistinguishable from the liberty interests of a parolee facing revocation) were not violated by the Governor's review. (In re Sturm, supra, 11 Cal.3d at pp. 268-269, 113 Cal.Rptr. 361, 521 P.2d 97 [an inmate's rights to due consideration cannot exist in any practical sense unless there also exists a remedy against their abrogation]; In re Bowers (1974) 40 Cal. App.3d 359, 362, 114 Cal.Rptr. 665 [the "proper function of the courts in respect to parole and revocation of parole is simply to *82 ensure that the prisoner is accorded due process"].)
Beyond that, we need only paraphrase the holding of In re Ramirez vis-à-vis the Board. "Judicial oversight must be extensive enough to protect the limited right of parole applicants `to be free from an arbitrary parole decision . . . and to something more than mere pro forma consideration.' [Citation.] The courts may properly determine whether the [Governor's] handling of [his review of a parole suitability or unsuitability finding] is consistent with the parole policies established by the Legislature. [Citation.] While courts must give great weight to the [Governor's] interpretation of the parole statutes and regulations, final responsibility for interpreting the law rests with the courts. [Citation.] Courts must not second-guess the [Governor's] evidentiary findings. [Citation.] However, it is the proper function of judicial review to ensure that the [Governor] has honored in a `practical sense' the applicant's right to `due consideration.' [Cit
ation.] This function is best served by examining the [Governor's] parole suitability [decisions] under a deferential abuse of discretion standard. The [Governor's] decision should not be disturbed [when it is] supported by some evidence." (In re Ramirez, supra, 94 Cal. App.4th at p. 564, 114 Cal.Rptr.2d 381.)
From this perspective, we consider the superior court's order.

1.
Since the Constitution imposes upon the Governor a duty to base his review of the Board's decision on the same factors controlling the Board's decision, our review of the one is necessarily the same as the other. (In re Arafiles, supra, 6 Cal. App.4th at pp. 1480-1481, 8 Cal.Rptr.2d 492 ["the Governor's review is limited to the record that was before the parole authorities" and he must "base his decision on the same factors" that the Board "was required to consider in making its parole release decision"]; In re Ramirez, supra, 94 Cal.App.4th at pp. 559-60, 114 Cal. Rptr.2d 381.) There is no law to the contrary.

2.
Since we held in Rosenkrantz II that the finding of unsuitability made by the Board on September 9, 1999, was "unsupported by any evidence and that the . . . decision [could not] stand" (Rosenkrantz II, supra, 80 Cal.App.4th at pp. 424, 427, 95 Cal.Rptr.2d 279), and since it is undisputed that no new evidence was presented to the Board at its June 30, 2000, hearing, and since it is undisputed that no new evidence was or could have been submitted to the Governor (In re Arafiles, supra, 6 Cal.App.4th at p. 1481, 8 Cal.Rptr.2d 492; In re Ramirez, supra, 94 Cal.App.4th at pp. 559-60, 114 Cal. Rptr.2d 381), it necessarily follows that there is no evidence to support the Governor's decision reversing the Board's suitability finding. Our decision in Rosenkrantz II is the law of the case.
"`"The doctrine of the law of the case is this: That where, upon an appeal, the [reviewing] court, in deciding the appeal, states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal, and . . . in any subsequent suit for the same cause of action, and this although in its subsequent consideration this court may be clearly of the opinion that the former decision is erroneous in that particular."' The principle applies to criminal as well as to civil matters [citations], and it applies to [the Supreme *83 Court] even though the previous appeal was before a Court of Appeal [citation]. [¶] The principal reason for the doctrine is judicial economy. `Finality is attributed to an initial appellate ruling so as to avoid the further reversal and proceedings on remand that would result if the initial ruling were not adhered to in a later appellate proceeding.' [Citation.] Because the rule is merely one of procedure and does not go to the jurisdiction of the court [citations], the doctrine will not be adhered to where its application will result in an unjust decision, e.g., where there has been a `manifest misapplication of existing principles resulting in substantial injustice' [citation], or the controlling rules of law have been altered or clarified by a decision intervening between the first and second appellate determinations [citation]. The unjust decision exception does not apply when there is a mere disagreement with the prior appellate determination. [Citation.]" (People v. Stanley (1995) 10 Cal.4th 764, 786-787, 42 Cal.Rptr.2d 543, 897 P.2d 481, emphasis added.)
Where the reviewing court has determined on the first appeal, as a matter of law, that there was "no sufficient evidence," and there was "no substantial difference in the evidence at the retrial, the former decision is the law of the case." (Stromer v. Browning (1968) 268 Cal.App.2d 513, 521, 74 Cal.Rptr. 155, emphasis added, cited with approval in People v. Shuey (1975) 13 Cal.3d 835, 842, 120 Cal.Rptr. 83, 533 P.2d 211; Estate of Baird (1924) 193 Cal. 225, 234, 223 P. 974; see also Clemente v. State of California (1985) 40 Cal.3d 202, 210-212, 219 Cal. Rptr. 445, 707 P.2d 818; People v. Medina (1972) 6 Cal.3d 484, 491-492, 99 Cal.Rptr. 630, 492 P.2d 686.) Because the law of the case doctrine controls disposition of this appeal, we reject the Governor's assertion that, in Rosenkrantz II, we (along with Rosenkrantz's psychologists and supporters) have "failed to address the significance of [Rosenkrantz's] post-offense conduct." We held in Rosenkrantz II that the decision denying parole was unsupported by any evidence. Rosenkrantz is final. It is the law of the case and cannot be second-guessed by the Governor or by us.

3.
Since there is no evidence at all to support the Governor's decision, there is no way to say that Rosenkrantz was afforded the due process of law to which he was entitled. Under the most deferential test, we see no way to uphold a gubernatorial decision that is unsupported by any evidenceand not even the Governor contends that we should go that far. His ultimate argument is that, assuming the courts have the power to review his decisions, the judicial branch cannot interfere if there is "some evidence" to support his findings. (See Superintendent v. Hill (1985) 472 U.S. 445, 455-56, 105 S.Ct. 2768, 86 L.Ed.2d 356 [the "some evidence" standard is satisfied if there was any evidence to support the conclusion reached by the decisionmaker]; Edwards v. Balisok (1997) 520 U.S. 641, 648, 117 S.Ct. 1584, 137 L.Ed.2d 906 [even under the most minimum standards applied to prison disciplinary hearings, the "some evidence" standard applies to questions of evidentiary sufficiency].) He does not address the particular problem presented by the unavoidable application of the law of the case doctrine to this case.
Under the presumably unique circumstances of this case, we need not decide just how much evidence is "some evidence" in a more commonplace case. For the same reason, we need not reach the superior court's finding that the Governor has a "no parole policy."

*84 DISPOSITION
The judgment is affirmed.
I concur: MALLANO, J.
ORTEGA, Acting P.J.
I dissent. In my view, this court may examine the record, unfettered by the law of the case doctrine, to determine whether, under the deferential "`some evidence'" standard adopted in In re Rosenkrantz (2000) 80 Cal.App.4th 409, 423, 95 Cal. Rptr.2d 279 (Rosenkrantz II), sufficient evidence exists to support the Governor's finding of parole unsuitability. In applying that standard here, I would affirm the Governor's decision. I would also find the record fails to support a finding that the Governor has a no-parole policy for murderers that deprived Rosenkrantz of due process. I would reverse the trial court order granting the habeas corpus petition.[1]

Brief Summary of Facts
On September 9, 1999, the Board of Prison Terms granted Rosenkrantz a parole date after unanimously finding him unsuitable for parole. In setting a date despite the unsuitability finding, the Board acted under the compulsion of an April 30, 1999, superior court order by Judge Stoltz. The April 30 order directed that "`[u]nless there are changed circumstances or new information . . . that was not previously presented to the Board,' the Board was `to set a parole date' for Rosenkrantz." (Rosenkrantz II, supra, 80 Cal.App.4th at p. 421, 95 Cal.Rptr.2d 279.)
In November 1999, the Governor reversed the Board's September 9 decision, noting an appeal was pending from the April 30 order. (Rosenkrantz II, supra, 80 Cal.App.4th at pp. 421-422, 95 Cal. Rptr.2d 279.)
In December 1999, Rosenkrantz moved to "`enforce'" the April 30 order, claiming that the Board's failure to find him suitable for parole had triggered the clause directing his immediate release. (Rosenkrantz II, supra, 80 Cal.App.4th at p. 422, 95 Cal.Rptr.2d 279.) On January 20, 2000, Judge Stoltz found the Board to be in violation of the April 30 order, but did not order Rosenkrantz's release. Instead, Judge Stoltz ordered the Board to conduct a new hearing at which the Board would be barred from finding Rosenkrantz unsuitable for parole due to the cruel or callous manner in which the offense was committed or the nature of the commitment offense. Judge Stoltz again ordered that in the absence of changed circumstances or new information not previously presented to the Board, the Board was to set a parole date. (Id. at p. 422, fn. 15, 95 Cal.Rptr.2d 279.)
The Board, in compliance with the January 20 order, set a new hearing date for March 17, 2000. (Rosenkrantz II, supra, 80 Cal.App.4th at p. 422, 95 Cal.Rptr.2d 279.) The Board also filed a writ of mandate petition seeking to set aside the January 20 order. We consolidated the writ proceeding with the Board's pending appeal from the April 30 order. (Ibid.)
Rosenkrantz, concerned about the pending appeal from the April 30 order, asked Judge Stoltz to vacate the January 20 order. (Rosenkrantz II, supra, 80 Cal. App.4th at p. 422, 95 Cal.Rptr.2d 279.) After the January 20 order was vacated, the Board vacated the March 17 hearing date. (Id. at p. 423, 95 Cal.Rptr.2d 279.)
*85 On April 27, 2000, we issued Rosenkrantz II, which affirmed the April 30 order directing the Board to grant a new hearing. Regarding the enforcement issue raised by the mandate petition, we stated in part: "Although the issue raised by the mandate petition (the superior court's power to enforce its orders) may be temporarily moot, it is probable that it will arise again. For that reason, we consider the substance of the superior court's January 20 order (as well as all of the proceedings leading to that order), and address (but do not resolve) the enforcement issue. [Citations.]" (Rosenkrantz II, supra, 80 Cal. App.4th at p. 423, 95 Cal.Rptr.2d 279.) We declined to resolve the enforcement issue because the Board had not yet provided Rosenkrantz with a fair hearing: "We conclude that the enforcement issue is not ripe for decision at this time. We reach this conclusion because we do not believe the Board has, as yet, satisfied the spirit of the superior court's April 30, 1999, order for a new suitability hearing conducted according to the laws of this state and the regulations governing the Board's parole decisions. It is one thing to go through the motions so that a panel can recite a post hoc rationalization for a decision already made. It is quite another to hold a fair hearing at which three unbiased commissioners actually read the reports and other documents in Rosenkrantz's file and then make a reasoned decision based on the appropriate factors." (Rosenkrantz II, supra, 80 Cal.App.4th at pp. 427-428, 95 Cal.Rptr.2d 279.)
The disposition in Rosenkrantz II stated: "The April 30, 1999, order is affirmed. The petition for a writ of mandate is granted in part and dismissed in part, as follows: The Board of Prison Terms is ordered to schedule and commence a new suitability hearing . . ., and to render a new determination in strict accordance with both the letter and the spirit of the views expressed in this opinion. Jurisdiction to enforce this order, and to make and enforce such other orders as are necessary in aid thereof, is vested in the superior court." (Rosenkrantz II, supra, 80 Cal. App.4th at p. 429, 95 Cal.Rptr.2d 279.)
In compliance with Rosenkrantz II, the Board held a new hearing on June 30, 2000. New arguments were made but no new evidence was presented. The Board, concluding it was "`limited by the confines' " of the April 30 order and the Rosenkrantz II decision, acted against its own judgment and issued a suitability finding. (Davis v. Superior Court (Rosenkrantz) (Feb. 22, 2001, No. B146421 [non pub. opn. at p. 2)] [Rosenkrantz III].) The superior court ordered Rosenkrantz's immediate release on parole and a stay was issued. The case was then transferred to the Governor.
On October 28, 2000, after independently reviewing the same record that was before the Board at the September 9,1999, hearing, the Governor reversed the Board's June 30 finding of suitability. (Cal. Const., art. V, § 8(b); Pen.Code, § 3041.2.)
Rosenkrantz filed an amended habeas corpus petition in November 2000, naming the Governor, for the first time, as a party. After the Governor raised a successful peremptory challenge against Judge Stoltz (Code Civ. Proc., § 170.6; Rosenkrantz III), the habeas petition was heard by Judge Gutman.
Judge Gutman found there was no evidence to support the Governor's unsuitability finding, and concluded the Governor had violated Rosenkrantz's right to due process. Alternatively, Judge Gutman found that the Governor's no-parole policy for murderers had denied Rosenkrantz an individualized determination of his suitability for parole, thereby violating his right to *86 due process. The Governor now appeals from Judge Gutman's order granting the habeas corpus petition.

The Law of the Case Doctrine Does Not Preclude Our Review of the Governor's Decision
The majority opinion states that because the Governor reviewed the same September 9, 1999, record that was found in Rosenkmntz II to be devoid of any evidence to support the Board's September 9 finding of unsuitability (Rosenkrantz II, supra, 80 Cal.App.4th at pp. 424, 427, 95 Cal. Rptr.2d 279), it necessarily follows, under the law of the case doctrine, that the Governor's decision is also unsupported by the evidence.
I disagree with the majority opinion's analysis of the law of the case doctrine for two reasons. First, the doctrine does not apply to a new party in a new proceeding. Second, the doctrine, even if applicable, does not include dicta.

The Governor Is A New Party In This New Proceeding
In Rosenkrantz III, we issued a writ of mandate ordering the superior court to grant the Governor's peremptory challenge against Judge Stoltz. We found the Governor's challenge to be timely because the habeas corpus proceeding was, with regard to the Governor, a new proceeding against a new party who was not involved in Rosenkrantz II. (Rosenkrantz III, supra, typed opn. at pp. 3, 9-10).
The law of the case doctrine applies to "the same parties in any subsequent retrial or appeal in the same case." (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 895, p. 928, italics added.) Although the present habeas corpus proceeding is related to the Board's appeal and writ of mandate petition of Rosenkrantz II, it is not the same proceeding against the same parties. (Rosenkrantz III, supra, B146421.)
The Governor's findings, which followed his independent evaluation of the September 9 record, should be evaluated on their own merits. The driving force behind our Rosenkrantz II decision was the Board's repeated failure to "actually read the reports and other documents in Rosenkrantz's file and then make a reasoned decision based on the appropriate factors." (Rosenkrantz II, supra, 80 Cal.App.4th at pp. 427-428, 95 Cal.Rptr.2d 279.) By applying the law of the case doctrine to this new habeas proceeding against the Governor, who was not a party in Rosenkrantz II, the majority opinion has arbitrarily and summarily rejected the Governor's appeal solely based upon the Board's past sins of having failed to read the record and provide a proper hearing. (Ibid.) Once the Board complied with Rosenkrantz II's disposition by conducting a new hearing and issuing new findings on June 30, however, the old proceedings involving the Board and controlled by Rosenkrantz II were finished. As we stated in Rosenkrantz III: "Before the governor was involved, every court order was directed to the Board. The trial court ordered the Board to take certain actions. The matter was appealed. We issued an opinion. A remittitur issued. The Board complied with the appellate decision. At that point, the Board ceased to be a participant in the process, and the case bore all the marks of finality with reference to the Board. Up to this point, no trial or appellate court action had been directed to the governor. [¶] Subsequently, the governor issued the result of his independent review. Rosenkrantz now seeks to have the governor's decision overturned. We consider this a new action, although it obviously is related to the action against the Board." (Rosenkrantz III, supra, B146421, italics added.)
*87 The majority opinion concludes the law of the case doctrine binds the Governor simply because the September 9 record reviewed by the Governor was the same record deemed insufficient in Rosenkrantz II to support the Board's September 9 finding of unsuitability. This overlooks the fact, however, that in Rosenkrantz II we rejected the Board's September 9 finding of unsuitability because the Board had not fully read the record or provided a fair hearing. Given that the Board had not fully reviewed the September 9 record, how could we possibly have known, without having prejudged the evidence, whether a full review of the record would or would not yield "some evidence" to support the Governor's unsuitability finding? How could we have fully reviewed the September 9 record in Rosenkrantz II when the Board had not fully reviewed the record or provided a fair hearing? [2]
In my view, our pronouncement in Rosenkrantz II that the Board's September 9 finding of unsuitability was "unsupported by any evidence and . . . the panel's decision cannot stand" (Rosenkrantz II, supra, 80 Cal.App.4th at p. 427, 95 Cal.Rptr.2d 279), must not be taken out of its proper context. Under the unique facts of Rosenkrantz II, where the Board had failed to review the record or provide a proper hearing, we rejected the Board's findings. To avoid prejudging the evidence and usurping the Board's considerable authority over parole decisions, we sent the matter back for a new hearing so the Board, in the first instance, could properly evaluate the evidence and provide a fair hearing.
The Insufficiency Finding Was Not Necessary to Our Prior Decision
The law of the case doctrine is limited to points of law that were necessary to the prior decision. According to Witkin, "It is fundamental that the point relied on as law of the case must have been necessarily involved in the case. Accordingly, a dictum is not binding." (9 Witkin, Cal. Procedure, supra, § 910, p. 945.)
Rosenkrantz II held that the Board, due to its failure to review the record and provide a fair hearing, must hold another hearing. Our primary objective in Rosenkrantz II was to require the Board, in the first instance, to review the record and provide a fair hearing. In that regard, Rosenkrantz II is in accord with Ramirez's statement that "[t]he Board must be given every opportunity to lawfully exercise its discretion over [the prisoner's] parole application." (In re Ramirez (2001) 94 Cal.App.4th 549, 572, 114 Cal.Rptr.2d 381, 398).
In my view, Rosenkrantz II did not preclude the Board from reexamining the September 9 record and considering "old" evidence that the Board had previously failed to consider. Accordingly, I would find that the Governor was also free to examine the September 9 record *88 for evidence to support his independent review of the Board's findings.
The Governor's review of the Board's findings is not a limited appellate review for sufficient evidence. The Governor is free to "affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider." (Cal. Const., art. V, § 8(b).) Accordingly, the Governor may independently balance and reweigh the relevant factors without deferring to the Board's findings.
In our disposition in Rosenkrantz II, we ordered the Board to conduct a new hearing. We did not dictate to the Board that the application must be granted as a matter of law. Nevertheless, the Board granted the application after stating it believed it was compelled to do so by the April 30 order and our decision in Rosenkrantz II. (Rosenkrantz III, supra, typed opn. at p. 2.) The Board's belief evidently stemmed from the compulsory language in Judge Stoltz's April 30 and January 20 orders, which the Board had challenged in the writ of mandate petition. Those orders directed that "`[u]nless there are changed circumstances or new information . . . that was not previously presented to the Board,' the Board was `to set a parole date' for Rosenkrantz." (Rosenkrantz II, supra, 80 Cal.App.4th at pp. 421, 422, fn. 15, 95 Cal.Rptr.2d 279.) We declined to resolve the writ of mandate's enforcement issue, however, because the Board had failed to review the full record and conduct a fair hearing. (Id. at pp. 427-428, 95 Cal.Rptr.2d 279.)
Due to the Board's failure to review the full record, I believe Judge Stoltz's phrase, "new information . . . that was not previously presented to the Board," may be given either an expansive or a restrictive definition. Under the expansive definition, which I favor, "new information . . . that was not previously presented" would include "old" evidence that the Board had previously failed to read and consider. Under the expansive definition, the fact that no new evidence was "presented" at the June 30 hearing would not necessarily have precluded the Board (and the Governor) from finding Rosenkrantz unsuitable for parole.
Under the restrictive definition, which the Board adopted, "new information . . . that was not previously presented" would exclude "old" evidence that the Board had previously failed to read and consider. Accordingly, the fact that no new evidence was "presented" at the June 30 hearing necessarily required the Board (and the Governor) to find Rosenkrantz suitable for parole. In other words, the Board (and the Governor) was barred from considering the old September 9 record, even though the Board had failed to fully review that record at the September 9 hearing.
The Board, applying the restrictive definition, concluded that due to the absence of new evidence at the June 30 hearing, it must find Rosenkrantz suitable for parole under the compulsory language of Judge Stoltz's April 30 order, which we affirmed in Rosenkrantz II. Rosenkrantz II, however, did not resolve the writ of mandate issue regarding the compulsory language of the April 30 order. Accordingly, I do not believe our holding in Rosenkrantz II either precluded the Board from reconsidering the September 9 record or compelled the Board to grant a parole date against its own judgment of the correct application of the law to the record.
In refusing to resolve the enforcement issue in the writ of mandate petition in Rosenkrantz II, we stated: "We conclude that the enforcement issue is not ripe for decision at this time. We reach this conclusion because we do not believe the Board has, as yet, satisfied the spirit of the *89 superior court's April 30, 1999, order for a new suitability hearing conducted according to the laws of this state and the regulations governing the Board's parole decisions. It is one thing to go through the motions so that a panel can recite a post hoc rationalization for a decision already made. It is quite another to hold a fair hearing at which three unbiased commissioners actually read the reports and other documents in Rosenkrantz's file and then make a reasoned decision based on the appropriate factors." (Rosenkrantz II, supra, 80 Cal.App.4th at pp. 427-428, 95 Cal.Rptr.2d 279.)
Given our determination that the Board must, in the first instance, properly exercise its broad discretion over the parole application by reviewing the record and granting a new hearing, I do not believe Rosenkrantz II precluded the Board from considering and relying upon the September 9 record, particularly the documents it had previously failed to read. Judicial restraint in Rosenkrantz II was entirely appropriate. (In re Ramirez, supra, 94 Cal. App.4th 549, 114 Cal.Rptr.2d 381), which was decided after Rosenkrantz II, held in part that trial courts should refrain from reweighing the evidence before the Board and ordering the Board to set a parole date. Ramirez stated: "[T]he trial court erred by making its own evaluations of the evidence before the Board, and by ordering the Board to set a parole date. In deference to the Board's broad discretion over parole suitability decisions, courts should refrain from reweighing the evidence, and should be reluctant to direct a particular result. ([In re] Powell (1988) 45 Cal.3d 894, 904, 248 Cal.Rptr. 431, 755 P.2d 881 ....) The Board must be given every opportunity to lawfully exercise its discretion over [the prisoner's] parole application." (Id. at p. 571, 114 Cal.Rptr.2d at p. 398.)
Although the Board believed otherwise, Rosenkrantz II did not strip the Board of its authority to exercise its broad discretion over Rosenkrantz's parole application. In my view, Rosenkrantz II correctly sought to address the Board's repeated failures to consider all of the relevant evidence in the record and provide a fair hearing. Although we said we "anticipate that the Board will find Rosenkrantz suitable for release on parole and that a parole date will be set," (Rosenkrantz II, supra, 80 Cal.App.4th at p. 428, 95 Cal.Rptr.2d 279), we did not go so far as to dictate that outcome.
In this appeal, the majority opinion states that because Rosenkrantz II found the September 9 record to be insufficient to support the Board's unsuitability finding, it necessarily must follow that the same record fails to support the Governor's unsuitability finding. The one does not necessarily follow from the other. Although both had access to the same record, we know from Rosenkrantz II that the Board failed to review that record.
When we reviewed the Board's September 9 findings in Rosenkrantz II, we were faced with incomplete findings based on the Board's incomplete review of the record. The Governor, however, has conducted his own review of the record, presumably untainted by the Board's prior lapses. The Governor's detailed findings indicate he has conducted a far more thorough review of the record and evaluation of the relevant evidence and factors required by law. Accordingly, I disagree that the law of the case doctrine precludes us from reviewing the merits of the Governor's independent findings based on his independent review of the record.

The Rosenkrantz II Decision
Given my belief that Rosenkrantz II does not dictate the outcome of this appeal, *90 I will discuss other problems I perceive in applying the law of the case doctrine to this appeal. While I agree with the holding in Rosenkrantz II that the Board was required to conduct a new hearing due to its failure to consider all of the relevant evidence, I disagree with dicta in Rosenkrantz II that discussed the merits of the Board's decisions.

The Evidence Cited in Rosenkrantz II Was Not Conclusive
Page 424 of Rosenkrantz II cited footnotes 2, 6, and 7 to support the statement that "all of the evidence" favored a finding of suitability. The opinion said: "At the September 9, 1999, suitability hearing, there was no evidence to suggest that Rosenkrantz poses an unreasonable risk to society. All of the evidence is to the contrary. (See fns. 2, 6, 7, ante.)" (Rosenkrantz II, supra, 80 Cal.App.4th at p. 424, 95 Cal.Rptr.2d 279.) Pages 426-427 of Rosenkrantz II again cited footnote 7 to support the statement that "all of the evidence" supports a finding of suitability: "There is no reference to any evidence that might support such a finding [of unsuitability], and we have found none. Indeed, all of the evidence before the commissioners shows just the oppositethat Rosenkrantz has faced, discussed, understood and learned to cope with stress in a nondestructive manner, and that he is neither unpredictable nor a threat to others. (See fn. 7, ante.)" (Id. at pp. 426-427, 95 Cal.Rptr.2d 279.)
In my opinion, footnotes 2, 6, and 7 of Rosenkrantz II do not rule out an unsuitability finding as a matter of law. Footnote 2 simply discusses the Board's suitability finding of June 1996, and the positive factors in support thereof. (Rosenkrantz II, supra, 80 Cal.App.4th at p. 414, fn. 2, 95 Cal.Rptr.2d 279.) The positive factors mentioned in footnote 2 were thrown into doubt, however, when the Decision Review Unit overturned the Board's suitability finding in August 1996 (id. at p. 414, fn. 3, 95 Cal.Rptr.2d 279). Footnote 6 describes a correctional counselor's five-page report provided to the Board for the August 1997 hearing. (Id. at p. 416, fn. 6, 95 Cal. Rptr.2d 279.) The positive factors mentioned in footnote 6 were only one person's opinions and do not necessarily comprise unassailable evidence. Similarly, footnote 7 discusses a June 1997 "`Psychological Counsel Evaluation . . .' that was wholly favorable to Rosenkrantz." (Id. at p. 416, 95 Cal.Rptr.2d 279.) The psychological evaluation, although entirely favorable to Rosenkrantz, is not conclusive evidence that would necessarily foreclose the Governor from reweighing it against other less favorable evidence in the record.
Nothing in footnotes 2, 6, or 7 persuades me that Rosenkrantz's parole application is preordained, as a matter of law, to be granted at this time. Undoubtedly, the record contains evidence that Rosenkrantz has conducted himself well in prison and has availed himself of educational and vocational opportunities. I still do not believe, however, that reasonable minds must agree in predicting Rosenkrantz's present probability of success on parole. Parole release proceedings are not governed by immutable laws of mathematics. Instead, "a parole release proceeding is an attempt to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts...." (In re Sturm (1974) 11 Cal.3d 258, 266, 113 Cal.Rptr. 361, 521 P.2d 97.)
The Governor, who has independently evaluated the record and issued a detailed set of findings, is not required by dicta in footnotes 2, 6, and 7, or any other dicta in Rosenkrantz II, to conclude, as a matter of law, that Rosenkrantz is suitable for parole. Were it not for the majority opinion's *91 acceptance of the law of the case doctrine, this panel would now be reviewing the Governor's independent evaluation of the record and reaching the merits of his decision under the deferential "some evidence" test. I believe nothing in Rosenkrantz II bars us from conducting such a review.

The Nature of the Commitment Offense May be Considered
Rosenkrantz II agreed with "the Board's contention that `a parole denial may ultimately be based entirely on the nature of the commitment offense, as long as all other administratively prescribed "relevant factors" have been considered' by the Board." (Rosenkrantz II, supra, 80 Cal. App.4th at p. 426, fn. 18, 95 Cal.Rptr.2d 279, citing In re Seabock (1983) 140 Cal. App.3d 29, 38-39, 189 Cal.Rptr. 310.) But Rosenkrantz II deemed this correct legal principle to be "irrelevant in light of the Board's failure to consider all of the relevant and reliable information that was available to it, particularly the uncontroverted evidence showing that the crime was committed as the result of significant, long-term stress caused by Rosenkrantz's fear of his father (and the conduct of the victim that exacerbated that fear). As shown by the transcript of the September 9, 1999, hearing, the commissioners had not even read a number of the reports that are in Rosenkrantz's file. (See Dunn v. U.S. Parole Com'n (10th Cir.1987) 818 F.2d 742, 745 [rejecting a parole decision `ostensibly based' on parole risk because the record made it clear that the use of an 18-year-old insanity acquittal to calculate a presumptive parole date was based solely on punitive considerations; there was no evidence to support a finding of parole risk based on current mental illness, only a favorable recommendation based on exemplary institutional adjustment and a conclusion by the prison staff psychologist that the prisoner was not mentally ill; for these reasons, the denial was arbitrary and capricious and an abuse of discretion].)" (Rosenkrantz II, supra, 80 Cal.App.4th at p. 426, fn. 18, 95 Cal.Rptr.2d 279.)
Rosenkrantz II agreed with the theory that the nature of the commitment offense may be considered in ruling on a parole application, so long as all of the prescribed relevant factors are also considered. The panel then made two different findings. First, it analyzed and rejected the Board's three findings of unsuitability that were based on the nature of the commitment offense. (Rosenkrantz II, supra, 80 Cal. App.4th at p. 425, 95 Cal.Rptr.2d 279.) Second, it deemed the Board's ability to consider the nature of the commitment offense to be irrelevant, given the Board's failure to review all the evidence and provide a proper hearing. (Id, at p. 426, fn. 18, 95 Cal.Rptr.2d 279.)
I disagree with the first prong of the analysis in Rosenkrantz II of this issue. I do not believe the panel correctly rejected the merits of the Board's findings of unsuitability based on the nature of the commitment offense. I also do not believe we are bound by the prior discussion under the law of the case doctrine because, under the second prong of that analysis, the Board's findings based on the nature of the commitment offense were deemed irrelevant. "It is fundamental that the point relied on as law of the case must have been necessarily involved in the case. Accordingly, a dictum is not binding." (9 Witkin, Cal. Procedure, supra, § 910, p. 945.)
The law of the case doctrine is not ironclad. Where new evidence is introduced, "the former determination on sufficiency is, of course, inapplicable, and the doctrine cannot be invoked." (9 Witkin, Cal. Procedure, supra, § 908 at p. 943.) Although no *92 new evidence was presented at the June 30 hearing, the Governor was free to consider the September 9 record, including evidence that the Board did not consider, in making his decision. I therefore believe that so long as the Governor applied the correct factors and properly reviewed the record, he was free to deny parole based entirely on the nature of the commitment offense. As stated in Rosenkrantz II, "`a parole denial may ultimately be based entirely on the nature of the commitment offense, as long as all other administratively prescribed "relevant factors" have been considered' by the Board." (Rosenkrantz II, supra, 80 Cal.App.4th at p. 426, fn. 18, 95 Cal.Rptr.2d 279.)
The modern practice allows a departure from the law of the case doctrine where its application would result in an unjust decision. (9 Witkin, Cal. Procedure, supra, § 899, pp. 934-935, citing England v. Hospital of Good Samaritan (1939) 14 Cal.2d 791, 795, 97 P.2d 813.) For that reason, I would not apply the doctrine here. I believe the majority opinion has unjustly divested the Governor of his constitutional power to decide parole for murderers.
Under Penal Code section 3041, the Board is responsible for setting parole release dates "in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates. The board shall establish criteria for the setting of parole release dates and in doing so shall consider the number of victims of the crime for which the prisoner was sentenced and other factors in mitigation or aggravation of the crime...." (Pen.Code, § 3041, subd. (a).)
By statute, the Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (Pen.Code, § 3041, subd. (b).)
Pursuant to statute, the Board has enacted regulations (found in Cal.Code Regs., tit. 15) establishing criteria for setting release dates. According to section 2326, subdivision (a) of the regulations, "Criminal charges not resulting in conviction (charges which resulted in acquittal or dismissal for any reason) shall not affect the parole date unless the factual circumstances surrounding the charge are reliably documented and are an integral part of the crime for which the prisoner is currently committed to prison." Restated affirmatively, the regulations permit consideration of criminal charges not resulting in conviction, provided the factual circumstances surrounding the charge are reliably documented and are an integral part of the commitment offense.
Section 2326, subdivision (a) is significant here due to the serious nature of the commitment offense. According to Rosenkrantz II, supra, 80 Cal.App.4th at p. 412, 95 Cal.Rptr.2d 279, the following facts were established at trial: Rosenkrantz threw a high school graduation party at his parents' beach house on June 21, 1985. Rosenkrantz' brother Joseph and Joseph's friend Steven Redman crashed the party to confirm their suspicions that Rosenkrantz was gay. A fight ensued. The next day, Redman disclosed Rosenkrantz's homosexuality to Rosenkrantz's parents, knowing of his father's hatred of homosexuality and Rosenkrantz's desire to keep his homosexuality a secret from his parents. On June 22, Rosenkrantz was ousted from *93 his parents' house as a result of the disclosure. On June 23, Rosenkrantz practiced shooting at a shooting range. He also ordered an Uzi. On June 25, he picked up the Uzi. On June 26, he parked in front of Redman's house and slept in his car. When Redman emerged from the home on June 27, "Rosenkrantz confronted Redman, displayed the Uzi, and demanded that Redman retract the statements he had made to Rosenkrantz's parents. Redman refused, laughed, and called Rosenkrantz a `faggot.' Rosenkrantz shot Redman 10 times, then drove off." (Ibid.) According to the Board's findings of December 1996, "`At least one of the rounds was fired into the victim's head after he was down....'" (Id. at p. 415, fn. 5, 95 Cal.Rptr.2d 279.)
The jury acquitted Rosenkrantz of first degree murder, which means "the jury determined that due to the circumstances surrounding the killing there was reasonable doubt that defendant did in fact plan to kill Steven Redman before the shooting. Consequently the jury determined that the evidence was `insufficient to establish deliberation and premeditation.' (CALJIC No. 8.30.)" (People v. Rosenkrantz (1988) 198 Cal.App.3d 1187, 1204, 244 Cal.Rptr. 403 [Rosenkrantz I].)
Justice Hanson noted in Rosenkrantz I, however, that "[t]here was ample solid, credible evidence before this jury that defendant had entertained the intent to kill the victim during the week before the crime. Defendant's conduct in arming himself with a semi-automatic weapon after practicing its use on a shooting range, his statements to others, his successful attempt to locate the victim's residence, and his confrontation of the victim outside that residence after waiting there for many hours would have supported a conviction of premeditated first degree murder." (Rosenkrantz I, supra, 198 Cal. App.3d at p. 1204, 244 Cal.Rptr. 403.)
Although Rosenkrantz was acquitted of first degree murder, the law permits the Board (and the Governor) to consider the undisputed facts surrounding the crime that are reliably documented and an integral part of the crime. In this case, a legitimate argument can be made that the Board (and the Governor) may consider, under section 2326, subdivision (a) of the regulations, the reliably documented and integral factual circumstances of the murder. Included among those reliably documented and integral factual circumstances are the preparatory activities (ordering and purchasing the weapon, practicing shooting, calling the victim, and waiting in the parked van outside the victim's house the night before the crime) and the manner of execution (firing ten shots into the victim, including at least one shot to the unarmed victim's head after he was helpless and down on the ground).
Although reliable evidence of these circumstances was introduced at trial, the jury refused to return findings of premeditation and deliberation. Nevertheless, because these circumstances were reliably documented and were integral to the commitment offense, they may be considered so long as all other relevant factors are also taken into account. As stated in Rosenkrantz II, "In this regard, we note the Board's contention that `a parole denial may ultimately be based entirely on the nature of the commitment offense, as long as all other administratively prescribed "relevant factors" have been considered' by the Board. We agree ([15 CCR] 2402, subd. (b) [all `relevant, reliable information available to the panel shall be considered in determining suitability for parole']; In re Seabock (1983) 140 Cal.App.3d 29, 38-39, 189 Cal.Rptr. 310), but find the point irrelevant in light of the Board's failure to *94 consider all of the relevant and reliable information that was available to it, particularly the uncontroverted evidence showing that the crime was committed as the result of significant, long-term stress caused by Rosenkrantz's fear of his father (and the conduct of the victim that exacerbated that fear). As shown by the transcript of the September 9, 1999, hearing, the commissioners had not even read a number of the reports that are in Rosenkrantz's file...." (Rosenkrantz II, supra, 80 Cal.App.4th at p. 426, fn. 18, 95 Cal. Rptr.2d 279, italics added.)
I believe Rosenkrantz II, in dicta, prematurely rejected the merits of the Board's September 9 unsuitability findings, all of which were based on the nature of the commitment offense, when the Board had not even reviewed the full record. (Rosenkrantz II, supra, 80 Cal. App.4th at p. 425, 95 Cal.Rptr.2d 279.) Putting that objection aside, I also disagree with the analysis of the merits.
The Board's three findings of unsuitability were that the murder was carried out (1) in an especially cruel or callous manner, (2) in a dispassionate or calculated manner, such as an execution style murder, and (3) in a manner which demonstrates an exceptionally callous disregard for human suffering. (Rosenkrantz II, supra, 80 Cal.App.4th at p. 425, 95 Cal. Rptr.2d 279.)
In my view, the record contains "`some evidence'" (Rosenkrantz II, supra, 80 Cal. App.4th at p. 423, 95 Cal.Rptr.2d 279) to support the Board's finding that the murder was conducted with an especially callous disregard for human suffering. Firing ten shots from an Uzi, including at least one shot to the victim's head after he was down on the ground, supports the findings that the murder was carried out in an especially cruel or callous manner, and with an exceptionally callous disregard for human suffering. The significant planning and preparation evidence also supports the finding that the murder was carried out in a dispassionate or calculated manner. Regardless of the jury's rejection of a first degree murder charge, the Board was authorized to consider reliably documented evidence of careful preparation and planning that was integral to the commission of the crime.

The Governor's Decision Is Supported by Sufficient Evidence
Section 2402, subdivision (c) of the Regulations sets forth circumstances that are "general guidelines" in determining suitability for release. "[T]he importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." (Cal.Code Regs., tit. 15, § 2402, subd. (c).) In this instance, it was the Governor, not the Board, who decided the weight to be given to any particular circumstance or combination thereof.
According to the regulations, the circumstances tending to show unsuitability include:
"(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
". . .
"(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
". . .
"(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering...." (Cal.Code Regs., tit. 15, § 2402, subd. (c)(1)(B),(D).)
The circumstances tending to show suitability include: "Motivation for Crime. *95 The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time." (Cal.Code Regs., tit. 15, § 2402, subd. (d)(4).)
The Governor's findings included findings that Rosenkrantz was unsuitable for parole due to the serious nature of the commitment offense and his repeated attempts to minimize his culpability: "After reviewing the entire record and the factors considered by the Board of Prison Terms, I do not believe that Mr. Rosenkrantz is suitable for parole at this time. Courts have recognized that, in assessing an individual's suitability for parole, it is appropriate to weigh heavily the degree of violence used and the amount of viciousness shown by the individual's crime. In this case, it is my considered judgment that the gravity of Mr. Rosenkrantz's offense and his repeated attempts to minimize his culpability evidence a continued threat to the public requiring that he remain incarcerated."
The Governor also stated in part: "Mr. Rosenkrantz carefully planned, practiced, and prepared for the brutal killing of Mr. Redman. Moreover, Mr. Rosenkrantz lay in wait outside of Mr. Redman's house all night long before the murder, then attempted to lure Mr. Redman from his home under false pretenses. Mr. Rosenkrantz executed the brutal murder by pumping 10 shots into the body of Mr. Redmanthe last three or four shots into Mr. Redman's skull while he lay helpless on the pavement. He then fled the scene leaving his victim to die. As I have noted earlier, while the jury ultimately convicted Mr. Rosenkrantz of second degree murder, the Second District Court of Appeal in reviewing the conviction observed: `There was ample solid, credible evidence before this jury that the defendant had entertained the intent to kill the victim during the week before the crime. The defendant's act of arming himself with a semiautomatic weapon after practicing its use on a shooting range, his statements to others, his successful attempt to locate the victim's residence, and the confrontation of the victim outside the residence after waiting there for many hours would have supported a conviction of premeditated first degree murder.' [Rosenkrantz I, supra, 198 Cal.App.3d at p. 1204, 244 Cal.Rptr. 403.]"
I believe the Governor was entitled to consider the serious nature of the offense, regardless of the fact that Rosenkrantz was acquitted of first degree murder. This is not a case where it would have been impossible, as a matter of law, to obtain a first degree murder conviction. As we found in Rosenkrantz I, supra, 198 Cal.App.3d 1187, 244 Cal.Rptr. 403, there was sufficient evidence to support such a conviction. The jury's acquittal does not require the Governor to put his head in the sand and disregard the well-documented evidence of planning, preparation, practice, and intent that went into the crime.
Unlike the Board, which failed to consider the evidence of stress, the Governor mentioned stress several times: "The stress Mr. Rosenkrantz felt over disclosure of his homosexuality does not minimize the viciousness of this murder." "am not convinced that Mr. Rosenkrantz committed this murder in the heat of passion or under stress significant enough to offset the serious nature of this crime. [¶] Mr. Rosenkrantz has stated that his family relationship was outstanding and very supportive. As the probation report notes, Mr. Rosenkrantz additionally had access to numerous influential people who could have approached his parents to discuss the problems he believed he faced due to his homosexuality. He also had school counselors to turn to. But Mr. Rosenkrantz *96 failed to avail himself of these alternatives. Instead, he chose to `solve' the problem by simply killing Mr. Redman. He committed the murder a week later, during which time he went to a gun range and practiced, tried repeatedly to obtain an Uzi as quickly as possible, told co-workers of his intent to kill, and waited outside Mr. Redman's home overnight before shooting him 10 times at close range."
The weight to be given to the evidence of stress is for the Governor, and not this court, to decide. The Governor found the stress was not of such great magnitude as to lessen the severity of the offense, especially given the supportive and close friends, family, and other resources available to Rosenkrantz before the murder. Given that only six days elapsed between the graduation party and the murder, during which time Rosenkrantz meticulously planned, practiced, and prepared for the killing, I would not say, as a matter of law, that the Governor was required to give more weight to the evidence of long-term stress.
In addition to the nature of the commitment offense, the Governor also relied on evidence of Rosenkrantz's lack of remorse and failure to take full responsibility for the murder. The Governor stated: "While he admits to killing the victim, he has lied about numerous aspects of the offense in an attempt to mitigate his culpability. For example, he has referred to the incident at the beach house a week prior to the shooting as an attack upon himself. However, it was Mr. Rosenkrantz who used a stun gun on his brother multiple times while holding him on the ground, had Mr. Redman detained, forced his brother to retrieve tapes from his car, and stated that he was willing to kill both his brother and Mr. Redman to protect his secret. [¶] Additionally, Mr. Rosenkrantz has given conflicting statements at past parole hearings about making an inculpatory phone call to a nurse, while a fugitive, approximately two weeks after the murder. During that phone call, he told the nurse that he had done society a favor by killing Mr. Redman. Similarly, Mr. Rosenkrantz has consistently maintained at parole hearings that his father ordered him out of the house after the incident at the beach house. In fact, he testified at trial that he left voluntarily. [¶] While Mr. Rosenkrantz professes remorse, his contrary conduct and statements further indicate that he poses an unreasonable risk of danger to society. Courts have recognized that where a defendant acknowledges guilt, but shows no remorse, he may be expected to repeat the criminal conduct under similar circumstances. (People v. Key (1984) 153 Cal.App.3d 888, 900, 203 Cal.Rptr. 144.)"
Regarding Rosenkrantz's institutional behavior, the Governor stated: "Although Mr. Rosenkrantz has been discipline free and continued his education while in prison, the State of California expects this of all prisoners." The concurring opinion labels Rosenkrantz's accomplishments as being "extraordinary." I would not be so generous with my praise.
Doubtless, thousands of prisoners have, like Rosenkrantz, acquired an education and job skills while incarcerated and have remained discipline free. Accordingly, I am not prepared, unlike the concurring opinion, to call Rosenkrantz's accomplishments "extraordinary." The weight to be given to this positive factor is to be determined, like all others, by the Governor. (Cal.Code Regs., tit. 15, § 2402, subd. (c).)
In any event, regardless of my view of the sufficiency of the record, I find it unfortunate that this panel has refused to review the Governor's findings on their merits and has instead rejected the Governor's *97 appeal under the inapplicable law of the case doctrine.

The Governor's No Parole Policy
The trial court found that the Governor has a blanket policy of denying parole to murderers. The record does not support the trial court's finding.
According to Rosenkrantz, the record contains four uncontradicted facts that support the trial court's finding: "(1) the Governor has publicly stated that all murderers should spend the rest of their lives in prison and that extenuating circumstances will never mitigate the crime, (2) the Governor has reversed all but one of the 48 cases where the [Board] has granted parole, (3) the [Board] grants parole in only one percent of the cases (48 out of 4,800 hearing[s]); and (4) the Governor has never reviewed any case in which the [Board] denied parole."
Assuming, for the sake of discussion, that the import of the Governor's statement was that convicted murderers should be denied parole (in other words, assuming that I reject the Governor's contention that he was simply saying judges ought to impose indeterminate life terms for convicted murderers), the statement does not support a claim that the Governor is incapable of or disqualified from providing a full and fair review of the Board's findings.[3] The Governor is, of course, an elected state official who must campaign for public office. In making political statements for public consumption, the Governor will necessarily exhibit a bias to appeal to a class of voters. Those political statements do not disqualify the Governor from making full and fair parole decisions.
A similar claim was rejected in Roll v. Carnahan (8th Cir.2000) 225 F.3d 1016. Two death row inmates in Missouri filed a civil rights lawsuit to enjoin their executions. The inmates alleged that Governor Carnahan, who was then campaigning for the United States Senate in the November 2000 election, had campaigned on the issue of granting clemency petitions in death penalty cases. The inmates alleged in part that the Governor, due to his campaign statements, could not provide a full and fair review of their clemency petitions and would thus deny them of due process. The Eighth Circuit rejected the claim that the Governor was disqualified from making clemency decisions, finding the Governor's political statements failed to support a due *98 process violation claim. (Id. at pp. 1017-1018.)
This case is arguably distinguishable from Carnahan in that parole, not clemency, is involved. The Governor's discretion over parole decisions is more limited than over clemency petitions. Nevertheless, I believe the same rationale applies here as in Carnahan. Governors utter political statements every day. Once elected, such statements, whether made before or after winning office, should not disqualify them from performing the duties they were elected to perform. If such statements were sufficient grounds for disqualification, no elected official would be qualified to perform the duties of office.
At oral argument, Rosenkrantz's attorney stated that Governor Davis is disqualified from reviewing parole applications until he either provides a sworn statement attesting that he does not have a blanket policy of denying parole, or he grants a sufficient number of applications to show he has abandoned his blanket policy of denial. Rosenkrantz's position, if carried out, would result in a separation of powers battle as discussed in Hornung, supra, 81 Cal.App.4th 1095, 97 Cal.Rptr.2d 382, that is unnecessary. In my view, the alleged statement simply fails to support a claim of a blanket policy resulting in the denial of due process.
The remaining evidence cited by Rosenkrantz relies on a statistical analysis. That overwhelming numbers of petitions have been denied fails to persuade me of the existence of a blanket policy. Without examining the record of each rejected applicant, on a case-by-case basis, it is impossible to determine whether even one of the applications should have been granted as a matter of law. Given that all the applicants were convicted murderers, the denial of all but one application fails, without more analysis, to persuade me of the existence of a blanket policy of denial.
I disagree with the concurring opinion's assertion that the Governor failed to provide a sufficient review of the record in this case.[4] In my view, the Governor's detailed discussion of evidence (such as a probation report prepared for the sentencing hearing) and factors (such as the influence of long-term stress) refutes that notion. That the Governor elected to give more weight to the serious nature of the commitment offense and less weight to Rosenkrantz's accomplishments while incarcerated does not necessarily mean the Governor conducted a "pro forma review."
The concurring opinion's discussion of proportionality, particularly the references to In re Ramirez, supra, 94 Cal.App.4th 549, 114 Cal.Rptr.2d 381, is not persuasive given the vast differences between the circumstances of the second degree murder in Ramirez and in this case. Ramirez involved a second degree murder that occurred while Ramirez was driving the getaway car following an armed robbery. Ramirez lost control of the car and hit a center median while leading the police on a high-speed chase. The occupants were ejected, including Ramirez's 15-year-old accomplice who died from injuries sustained in the crash.
The facts of this case are of a far different sort. In this case, the victim's death was not the unintended result of reckless driving while evading police. As Justice Hanson noted in Rosenkrantz I, supra, 198 Cal.App.3d at p. 1204, 244 Cal.Rptr. 403, there was substantial evidence to support a finding in this case of a premeditated *99 first degree murder. Accordingly, the record supports the Governor's opinion that Rosenkrantz was fortunate to have escaped a first degree murder conviction. The Governor was entitled to consider the serious nature of the offense under section 2326, subdivision (a) of the regulations, despite the acquittal of the first degree murder charge.
I would reverse the trial court order granting the petition for habeas corpus.
MIRIAM A. VOGEL, J.
Obviously, I concur in the opinion I authored. I write separately to address the dissent's comments about the superior court's finding that the Governor has a "no parole policy," and to respond to some of the dissent's commentary about our decision in Rosenkrantz II.

A.
The superior court found that the Governor has a "no parole" policy for murderers sentenced to indeterminate terms, and that the application of that policy in this case violated Rosenkrantz's due process rights. The Governor contends there is insufficient evidence to support that finding. As explained in the majority opinion, our resolution of this appeal on other grounds makes it unnecessary to consider the superior court's "no parole" finding. Since the dissent has nevertheless addressed the issue, there are a few points that need to be made.

1.
First, uncontroverted evidence shows that in April 1999, the Governor told a reporter that "the [G]overnor was adamant that he believes murdererseven those with second-degree convictionsshould serve at least a life sentence in prison. Asked whether extenuating circumstances should be a factor in murder sentences, the [G]overnor was blunt: `No. Zero,' he said.... The [G]overnor, a political centrist, said he may surprise followers who expect him to be a more traditional Democrat. `They must not have been listening when I was campaigning,' Davis said. `If you take someone else's life, forget it. I just think people dismiss what I said in the campaign as either political hyperbole or something that I would back away from.... We are doing exactly what we said we were going to do.'" The Governor has never disavowed these statements or claimed that they were not made.
Second, uncontroverted evidence established that, since the Governor assumed office, the Board has held about 4,800 parole suitability hearings and granted parole to only 48 inmates serving indeterminate sentences for first or second degree murder. The Governor reversed 47 of the 48 suitability findings. The 48th prisoner was Rose Ann Parker, who had served 15 years of a 15 year to life sentence imposed for the murder of her boyfriend at a time when battered woman syndrome was not a defense in California (it is clear that, had it been a defense, Parker would have been exonerated). The Governor's decision to allow Parker's release was made in September 2000, long after Rosenkrantz's petition was filed and long after the Governor's policy had become a subject of public scrutiny.
Third, uncontroverted evidence established that the Governor has never reviewed a murder case in which the Board found a prisoner unsuitable for parole.
Since no one has manipulated or distorted these facts and statistics (not even the Governor has suggested any such thing), and since no authority is cited for the dissent's assertion that a blanket policy cannot be proved without a case-by-case *100 determination, I believe the evidence is sufficient to overcome the presumption of regularity. (In re Arafiles (1992) 6 Cal. App.4th 1467, 1478, 8 Cal.Rptr.2d 492; Hornung v. Superior Court (2000) 81 Cal. App.4th 1095, 1099, 97 Cal.Rptr.2d 382 [policies that control or attempt to control suitability and release date hearings for life prisoners are subject to inquiry]; In re Pratt (1999) 69 Cal.App.4th 1294, 1314, 82 Cal.Rptr.2d 260 [if supported by substantial evidence, factual findings in a habeas corpus proceeding are controlling on appeal]; County of Del Norte v. City of Crescent City (1999) 71 Cal.App.4th 965, 973, 84 Cal.Rptr.2d 179 [when supported by substantial evidence, the trial court's foundational fact findings are conclusive on appeal].)

2.
Rosenkrantz's due process rights include the right to "individualized treatment" and "due consideration" of all relevant factors, and the Governor's decision cannot stand if it was made without due regard to the appropriate post-conviction, as well as preconviction, factors. (In re Sturm (1974) 11 Cal.3d 258, 268, 113 Cal.Rptr. 361, 521 P.2d 97; In re Minnis (1972) 7 Cal.3d 639, 644, 102 Cal.Rptr. 749, 498 P.2d 997 [the purpose of the indeterminate sentencing law is to make the punishment fit the criminal rather than the crime, and to attempt to put before the prisoner a great incentive to do well]; Hornung v. Superior Court, supra, 81 Cal.App.4th at p. 1100, 97 Cal.Rptr.2d 382; In re Seabock (1983) 140 Cal.App.3d 29, 36-37, 189 Cal.Rptr. 310.) For these reasons, the period of confinement is to be fixed "`in accordance with the adjustment and social rehabilitation of the individual analyzed as a human composite of intellectual, emotional and genetic factors.'" (In re Minnis, supra, 7 Cal.3d at p. 644, 102 Cal.Rptr. 749, 498 P.2d 997, italics omitted.) Indeed, the raison d'etre of the parole system is "`to mitigate the rigor of the old [penitentiary system] and . . . to provide a more humane management and prison discipline under which there is extended to those who may show a disposition to reform and whose reformation may reasonably be expected, a hope and prospect of liberation from the prison walls under the restrictions and conditions of a parole.... The legislative policy [was to create a system where] hope was to be held out to prisoners that through good conduct in prison and a disposition shown toward reformation, they might be permitted a conditional liberty upon restraint under which they might be restored again to society.'" (Ibid., quoting Roberts v. Duffy (1914) 167 Cal. 629, 634, 140 P. 260.)

3.
In my view, the Governor's no-parole policy creates a conclusive presumption that the public safety requires the continued and permanent incarceration of all first and second degree murderers. Because this presumption "`is not necessarily or universally true in fact,'" the presumption violates Rosenkrantz's due process right to a more individualized determination. (Cleveland Board of Education v. LaFleur (1974) 414 U.S. 632, 644-645, 94 S.Ct. 791, 39 L.Ed.2d 52, quoting Vlandis v. Kline (1973) 412 U.S. 441, 452, 93 S.Ct. 2230, 37 L.Ed.2d 63; Stanley v. Illinois (1972) 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551; see also People v. Ramirez (1979) 25 Cal.3d 260, 265-269, 158 Cal. Rptr. 316, 599 P.2d 622; In re Nesper (1990) 217 Cal.App.3d 872, 266 Cal.Rptr. 113.)
Rosenkrantz was entitled to the Governor's individualized determination of his parole suitability based upon the statutorily prescribed factors. In my view, the Governor's statement of decision defeats his claim that Rosenkrantz received the *101 required review. The Governor's decision focuses primarily on the commitment offense and conduct immediately following the offense, based upon which the Governor concluded that Rosenkrantz ought to "be grateful that he was not convicted of first degree murder." (Cf. In re Ramirez (2001) 94 Cal.App.4th 549, 569, fn 8, 114 Cal.Rptr.2d 381 fn. 8 [the Governor's discretion is not a license to recharacterize the commitment offenses as crimes carrying a more severe penalty].) Rosenkrantz's extraordinary accomplishments while incarcerated (Rosenkrantz II, supra, 80 Cal.App.4th at pp. 414, 416-418, 95 Cal.Rptr.2d 279, fns. 2, 7, 10, 11) were summarily dismissed with the Governor's comment that, although "Mr. Rosenkrantz has been discipline free and continued his education while in prison, the State of California expects this of all prisoners." (See In re Ramirez, supra, 94 Cal.App.4th at p. 571, 114 Cal.Rptr.2d 381 [noting that while the Board had "`commended'" Ramirez for "`doing very well'" in custody, "its decision failed to reflect consideration of Ramirez's institutional behavior as a circumstance tending to show his suitability for parole," a factor that the Board is required to consider].)
In the abstract, I agree with the dissent's statement that the gravity of the commitment offense may be a sufficient basis for denying a parole application. (See Rosenkrantz II, supra, 80 Cal. App.4th at p. 426, fn. 18, 95 Cal.Rptr.2d 279.) But that rule does not exist in the abstract. The rule is that parole may be denied based on the nature of the offense, but not without consideration of the "entire picture," and not on the basis of a pro forma review "which completely disregard] the individual prisoner's conduct in prison and his disposition toward reform." (In re Seabock, supra, 140 Cal.App.3d at pp. 36-37, 189 Cal.Rptr. 310.) I agree with the trial court that the Governor's "no parole" policy lies behind the Governor's decision about Rosenkrantz's parole, not a particularized consideration of the unique facts of this case. In my view, the Governor's statement that Rosenkrantz's extraordinary postconviction conduct is no more than that which "the State of California expects [from] all prisoners" says it all.

4.
"[T]he circumstances of any past offense, even any murder, are not necessarily a sufficient ground for the [Governor] to [reverse a suitability finding]. All violent crime demonstrates the perpetrator's potential for posing a grave risk to public safety, yet parole is mandatory for violent felons serving determinate sentences. [Citation.] And the Legislature has clearly expressed its intent that when murdererswho are the great majority of inmates serving indeterminate sentences approach their minimum eligible parole date, the Board `shall normally set a parole release date.' [Citation.] [A]n exception based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is `normally' to be granted. Otherwise, the Board's [and the Governor's] case-by-case rulings would destroy the proportionality contemplated by . . . section 3041, subdivision (a), and also by the murder statutes, which provide distinct terms of life without possibility of parole, 25 years to life, and 15 years to life for various degrees and kinds of murder. [Citation.]
"Therefore, a life term offense . . . underlying an indeterminate sentence must be particularly egregious to justify the [Governor's reversal of a suitability finding]. In order to comply with the parole policy established by the Legislature in . . . section 3041, the [Governor, like the Board] must [consider] the inmate's *102 criminal conduct not against ordinary social norms, but against other instances of the same crime or crimes.... [As must the Board, the Governor] must also consider the length of time the inmate has served in relation to the terms prescribed by the Legislature for the offenses under consideration, in order to arrive at a `uniform' term as contemplated by . . . section 3041, subdivision (a)." (In re Ramirez, supra, 94 Cal.App.4th at pp. 569-70, 114 Cal.Rptr.2d 381, emphasis added; see also In re Seabock, supra, 140 Cal.App.3d at pp. 36-38, 189 Cal.Rptr. 310.) To conclude otherwise is to obliterate the distinction between a life sentence with the possibility of parole, and a life sentence without the possibility of parole.
In my view, "the [Governor] lacked even 'some evidence' to support [his findings that Rosenkrantz did not commit the murder "under stress significant enough to offset the serious nature of this crime," that Rosenkrantz continues to lie "repeatedly . . . about aspects of the crime to minimize his culpability," that "Rosenkrantz should be grateful that he was not convicted of first degree murder," and that Rosenkrantz's prison record is no more than that which the "State of California expects . . . of all prisoners." These] finding[s][are] an affront not only to [Rosenkrantz], whose progress in [prison] was undisputedly exemplary, but also to the Department of Corrections, which provided the . . . programs [that Rosenkrantz participated in] and found [Rosenkrantz's] participation in them to be outstanding. The [Governor's] readiness to make a [decision] so at odds with the record supports [Rosenkrantz's] claim [and the superior court's finding that the Governor does in fact have a no-parole policy]." (In re Ramirez, supra, 94 Cal.App.4th at p. 571, 114 Cal.Rptr.2d 381.) As the superior court put it, the "discretion invested in the holder of an office must have been intended to be exercised according to the rules of reason and justice, not according to private opinion . . . and within those limits within which an honest man, competent to discharge the duties of his office, ought to confine himself. To do otherwise is to abuse the very discretion reposed in him."
At oral argument, my dissenting colleague asked Rosenkrantz's lawyer a series of questions about the effect of our affirmance of the superior court's finding that the Governor has a "no parole" policy. Now, the dissent turns one of counsel's answers into the proposition that an affirmance would mean the Governor "is disqualified from reviewing parole applications until he either provides a sworn statement attesting that he does not have a blanket policy of denying parole, or he grants a sufficient number of applications to show he has abandoned his blanket policy of denial." (Dis.opn., post at p. 98.) From the beginning of these habeas proceedings, it has been apparent to every other judge who has considered this case that it is unique, and that few (if any) prisoners could present so compelling a case. In my view, arguments based on broken floodgates cannot prevail in the drought of this desert.

B.
The dissent's attack on the decision in Rosenkrantz II ignores the record that was before us on that appeal and illustrates the mischief that can result when a court refuses to be bound by the law of the case doctrine.
To begin with, the law of the case doctrine applies to Rosenkrantz II, if at all, without regard to the correctness of the earlier opinion. (People v. Stanley (1995) 10 Cal.4th 764, 786-787, 42 Cal.Rptr.2d 543, 897 P.2d 481.) I note with interest the absence of any authority for the dissent's *103 suggestion that the doctrine does not apply in this case, particularly since it is plain that, notwithstanding the addition of the Governor along the way, this is fundamentally the same case it has always been (Rosenkrantz's habeas corpus petition), with precisely the same issues before the court, and (in matters of substance rather than form) the same parties (Rosenkrantz on the one hand and the State of California on the other). Since the law of the case doctrine applies, the dissent's disagreement with Rosenkrantz II is legally irrelevant.
The dissent says that Rosenkrantz II "did not preclude the Board from reexamining the [existing] record and considering 'old' evidence that the Board had previously failed to consider" and that, therefore, the Governor "was also free to examine the [same] record for evidence to support his independent review of the Board's finding." (Dissent, p. 87-88.) No authority is offered for this cherry-picking approach and I know of none. Carried to its logical conclusion, the rule propounded by the dissent would eviscerate the notion of judicial reviewevery time we found insufficient evidence to support the Board's finding, the Board would be permitted to paw through the same evidence in search of some other justification for its decision.
In any event, the dissent's characterization of Rosenkrantz II is inaccurate. As the author of that unanimous opinion, I can say with certainty that we reviewed the entire record, not just the matters purportedly relied upon by the Board, and found no evidence to support the Board's decision. Although we did not order Rosenkrantz's release, we did affirm Judge Stoltz's order, and we did direct the Board to hold a new hearing and to find, absent new evidence or changed circumstances, that Rosenkrantz was eligible for parole. We reminded the Board that the superior court had the power to enforce its orders by contempt, and encouraged the Board to "render a new determination in strict accordance with both the letter and the spirit of the views expressed" in Rosenkrantz II. (Rosenkrantz II, supra, 80 Cal.App.4th at p. 429, 95 Cal.Rptr.2d 279.) The wiggle room described in the dissent is the product of my dissenting colleague's wishful thinking, not of the opinion in Rosenkrantz II.
This is precisely the situation in which the law of the case doctrine must be appliedto ensure that changes in the composition of an appellate panel do not alter the rights of the parties established on an earlier appeal. Robert Rosenkrantz fairly won the right to be released on parole unless there was new evidence, and there is no need at this time to reach the broader issues about the Governor's "no parole" policy. In my view, the fact that two of the members of the original panel are no longer available (one retired, the other recused herself) does not confer on any member of the panel the right to start from scratch. The political process has littered the path of this case with a sufficient number of stumbling blocks. There is no need for the judiciary to join in the fray.
NOTES
[1] Undesignated section references are to the Penal Code.
[2] Subsequent references to sections 8(a) and 8(b) are to those sections of article V of the California Constitution.
[3] Section 8 of article V of the California Constitution now provides:

"(a) Subject to application procedures provided by statute, the Governor, on conditions the Governor deems proper, may grant a reprieve, pardon, and commutation, after sentence, except in case of impeachment. The Governor shall report to the Legislature each reprieve, pardon, and commutation granted, stating the pertinent facts and the reasons for granting it. The Governor may not grant a pardon or commutation to a person twice convicted of a felony except on recommendation of the Supreme Court, 4 judges concurring.
"(b) No decision of the parole authority of this state with respect to the granting, denial, revocation, or suspension of parole of a person sentenced to an indeterminate term upon conviction of murder shall become effective for a period of 30 days, during which the Governor may review the decision subject to procedures provided by statute. The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider. The Governor shall report to the Legislature each parole decision affirmed, modified, or reversed, stating the pertinent facts and reasons for the action." (Emphasis added.)
[4] As the superior court put it, "[i]f the people who enacted Article V, Section 8, had intended to make such a discretion absolute and unfettered, thus permitting the Governor to act arbitrarily and capriciously, then they should have done so by a very plain expression of that intent."
[5] As the Governor puts it, he may deny clemency for any constitutionally acceptable reason "or for no reason at all." As the Supreme Court has put it, a petitioner for clemency has nothing more than a "unilateral hope" that his sentence will be commuted. (Connecticut Board of Pardons v. Dumschat (1981) 452 U.S. 458, 465, 101 S.Ct. 2460, 69 L.Ed.2d 158.) Because California's clemency provision has "no definitions, no criteria, and no mandated `shalls,' [it] creates no analogous duty or constitutional entitlement." (Id. at p. 466, 101 S.Ct. 2460.)
[6] The Governor's reliance on Wallace v. Christensen (9th Cir.1986) 802 F.2d 1539, is misplaced. Wallace's holding that there is no judicial review in the federal parole system is based upon a federal statute that expressly eliminated judicial review. (Id. at p. 1545.) Wallace has nothing to do with the California Constitution or statutes.
[7] In his reply brief, the Governor contends that, "absent state provision for it," a life prisoner has no constitutional right to be considered for release on parole. Since California does provide for parole, and since Rosenkrantz was sentenced to prison for 15 years to life with parole, not life without the possibility of parole, the Governor's point is irrelevant.
[8] As Rosenkrantz observes, this cannot be the test. If the Governor denied parole to a prisoner based on the clearly erroneous belief that the person committed multiple first degree murders, a facial review of the decision would not reveal the error and (under the Governor's view) the decision would still stand. This is why the court has the right and obligation to review the record. (Dunn v. U.S. Parole Com'n (10th Cir.1987) 818 F.2d 742, 745.)
[1] Due to my conclusion that the habeas corpus petition was improperly granted, I need not delve into whether courts are empowered to review the Governor's parole decisions and, if so, the scope of such review.
[2] I so conclude because Rosenkrantz II held the Board must grant a new hearing at which it was to review all of the evidence and consider all of the relevant factors. Rosenkrantz II did not hold that the Board must release Rosenkrantz in the absence of new evidence or changed circumstances. Otherwise, Rosenkrantz II would not have remanded the matter to the Board for a new hearing, as it was obvious there was no new evidence to be submitted. In addition, Rosenkrantz II did not resolve the writ of mandate issue of whether the superior court could properly order Rosenkrantz's immediate release. Rather than conclude there was no evidence in the record to support a denial of parole, Rosenkrantz II, after recognizing that the Board may rely solely on the nature of the commitment offense in denying parole provided all other relevant factors are taken into account, afforded the Board another opportunity to review the entire record and exercise its considerable discretion over the application.
[3] Determining the import of the Governor's statement is problematic because of the separation of powers doctrine. In Hornung v. Superior Court (Zych & Jackson) (2000) 81 Cal.App.4th 1095, 97 Cal.Rptr.2d 382, two inmates serving indeterminate life terms filed habeas petitions after their parole applications were denied. The inmates alleged "that since 1992, the number of suitability grants had declined from about 5 percent during the Deukmejian administration to less than 1 percent during the Wilson administration." (Id. at p. 1098, 97 Cal.Rptr.2d 382.) The superior court issued an order to show cause and subpoenas were issued for two Board commissioners (petitioners Tom Hornung, a prison warden, and James Nielsen, chair of the Board) to appear at evidentiary hearings. (Id. at p. 1097, 97 Cal.Rptr.2d 382.) After the superior court denied the commissioners' motion to quash, the commissioners sought a writ of mandate, which was granted. In granting the writ, the appellate court stated in part: "Administrative officers performing a quasi-judicial function may not be questioned about their mental processes.... `Just as a judge cannot be subjected to such a scrutiny [citation], so the integrity of the administrative process must be equally respected. [Citation.]' [Citation.] The commissioners perform a quasi-judicial function when they decide to grant or deny parole. [Citation.] Therefore, the constitutional doctrine of separation of powers precludes the court from inquiring into the mental processes or motivation that underlie the commissioners' actions. [Citations.]" (Id. at p. 1099, 97 Cal. Rptr.2d 382.)
[4] Indeed, the superior court's language accuses the Governor of not having conducted himself as "an honest man."